COMMONWEALTH *vs.* EDWARD J. SOARES
(and three companion cases[1]).

Suffolk. September 11, 12, 1978. — March 8, 1979.

Present: HENNESSEY, C.J., QUIRICO, BRAUCHER, KAPLAN, WILKINS, LIACOS,
& ABRAMS, JJ.

*Homicide. Joint Enterprise. Jury and Jurors. Constitutional Law,*
Jury. *Practice, Criminal,* Challenge of jurors.

Motions for directed verdicts were rightly denied as to three defend-
ants indicted for murder in the first degree, based on a joint enter-
prise to commit murder, where there was evidence that the first
defendant brought a knife into a street brawl with students chasing
two prostitutes whom they suspected had taken a student's wallet,
that that defendant used the knife twice, conferred with the other
defendants following a pause, and pursued and threatened the stu-
dents before stabbing the victim with great force as the victim
attempted to disengage [469-470]; where there was evidence that
the second defendant conferred with the first defendant and others
before instigating the encounter, and that the second defendant
fought the victim and while pursuing the students knew the first
defendant had a knife and had a premeditated design to kill [470-
471]; and where there was evidence that the third defendant was
the first to confront the students and engaged in the common pur-
pose to protect the prostitutes and preclude recovery of the wallet,
that he knew the first defendant had a knife and intended to use
it, and that the third defendant by agreement positioned himself to
protect and assist the other defendants [471-472].

Discussion of the statement in *Swain* v. *Alabama,* 380 U.S. 202 (1965),
that "the presumption in any particular case must be that the
prosecutor is using the State's challenges to obtain a fair and impar-
tial jury . . . ." [474-477]

Analysis of the right of trial by a jury drawn from a fair and represen-
tative cross-section of the community. [477-483]

---

[1] One against Richard S. Allen and two against Leon Easterling.

· Discussion of peremptory challenges exercised under the authority of
G. L. c. 234, § 29. [483-485]

Article 12 of the Declaration of Rights of the Massachusetts Constitu-
tion proscribes the use of peremptory challenges to exclude prospec-
tive jurors solely by virtue of their membership, or affiliation with,
defined groupings in the community, such as those delineated in
the Equal Rights Amendment, art. 106 of the Amendments. [486-
488]

Examination of the mechanics incident to the effectuation of the con-
stitutional guaranty that peremptory challenges of prospective ju-
rors will not be improperly exercised. [489-490]

At the trial of three blacks indicted for murder of a white man and
for assaults on other white victims, use by the prosecutor of peremp-
tory challenges created a prima facie case of improper exercise
thereof on the basis of blacks being challenged because they were
black where it appeared that by such use twelve of the thirteen
available blacks were excluded from the venire, although one was
seated, with the result that ninety-two per cent of the available
blacks were excluded as contrasted with the exclusion of only
thirty-four per cent of the available whites, and that the defend-
ants' attempts during empanelment to have a full hearing on their
constant objections to the prosecutor's use of peremptory chal-
lenges were unsuccessful [490-491]; on appeal this court held that
the judge's failure to guarantee the right of the defendants under
art. 12 of the Declaration of Rights of the Massachusetts Constitu-
tion to be tried by an impartial jury of peers was prejudicial per se,
and the cases were remanded for a new trial [492]. BRAUCHER, J.,
concurring in the result, with whom QUIRICO and WILKINS, JJ.,
joined.

INDICTMENTS found and returned in the Superior Court
on December 17, 1976.

The cases were tried before *Roy,* J.

*Walter J. Hurley & Robert T. Capeless, Jr.,* for Edward
J. Soares.

*Richard K. Latimer* for Richard S. Allen.

*Wallace W. Sherwood* for Leon Easterling.

*Thomas J. Mundy & Dennis J. Curran,* Assistant Dis-
trict Attorneys, for the Commonwealth.

LIACOS, J. The defendants Soares, Allen, and Easterling
were indicted for the murder in the first degree of An-
drew Puopolo, as well as for other charges resulting from
a street brawl that occurred in the early morning of

November 16, 1976. A jury returned guilty verdicts of murder in the first degree as to each defendant, and the mandatory sentence of life imprisonment was imposed. In addition, Easterling was convicted of assault and battery on Thomas Lincoln by means of a dangerous weapon, for which he received a sentence of from eight to ten years to be served from and after the expiration of the sentence imposed in the murder conviction. Soares was indicted for assault and battery by means of a dangerous weapon on Stephen Saxon and Thomas Lincoln; he was convicted of simple assault and battery on each indictment. Both charges were filed. Allen was indicted for an assault and battery by means of a dangerous weapon on Thomas Lincoln. He was acquitted on this charge.

In these appeals pursuant to G. L. c. 278, §§ 33A-33G, the defendants assign and argue numerous errors. In light of the view we take of this case, we consider only those assignments pertaining to the denial of the defendants' motions for directed verdicts, and the prosecution's use of peremptory challenges. We hold that there was no error in the denial of the motions for directed verdicts. We hold, however, that there was sufficient evidence to create a prima facie case that the use of peremptory challenges by the prosecution was designed to exclude persons from the trial jury on the basis of race, and the failure of the trial judge to allow a hearing on this issue deprived the accused of their constitutionally protected right to a trial by a jury fairly drawn from the community. Consequently, we reverse.

We consider first the defendants' claims for directed verdicts. Within our discussion of each issue we will summarize the pertinent facts.

1. *Motions for Directed Verdicts.*

At the close of the Commonwealth's case and again after the defense rested, each defendant moved for directed verdicts on all charges related to the stabbing death of Andrew Puopolo. The judge denied the motions and noted the defendants' exceptions. Only the judge's denial of

their motions on that part of the indictments charging murder in the first degree is before us.[2] The issue raised by these motions is whether the evidence viewed in the light most favorable to the Commonwealth was sufficient to permit the jury to infer the essential elements of murder in the first degree. See *Commonwealth* v. *Sandler,* 368 Mass. 729, 740 (1975). For the purpose of resolving this issue, we consider only the evidence introduced during the Commonwealth's case in chief, *Commonwealth* v. *Kelley,* 370 Mass. 147, 150 (1976). We summarize that evidence.

On the evening of Monday, November 15, 1976, the Harvard College football team "broke training" with a dinner at the Harvard Club on Commonwealth Avenue in Boston. Alcoholic beverages were available before, during, and after the meal and formal ceremony. At approximately midnight, about fifty football players went to the "Naked I," a bar on Washington Street in Boston's "Combat Zone." At closing time (2 A.M.), the football players left the "Naked I" in various groups to share transportation back to Cambridge. Chester Stone, the equipment manager of the football team, had offered to drive six team members back to Harvard College in the team's equipment van, which was parked in a lot at Boylston

[2] In his brief, Easterling raises, then waives, a challenge to the denial of his motion on that part of the indictment charging murder in the second degree. Soares argues only that there was insufficient evidence to support a verdict of guilty of murder in the first degree. Although Allen contests the judge's denial as to lesser included crimes, he does so on one ground only—that the evidence does not permit an inference that he participated in a criminal venture, whatever the scope. He specifically concedes that the evidence does permit an inference that he knew of the venture. In the circumstances of these cases, the concession as to knowledge, assuming participation, disposes of the issue of malice. See *Commonwealth* v. *Chance,* 174 Mass. 245, 252 (1899), quoted in *Commonwealth* v. *McInerney,* 373 Mass. 136, 141 (1977).

No argument is made here as to the denial of such motions for directed verdicts as were filed in regard to the assault and battery indictments.

Street and Head Place. This group included Malcolm De-Camp, Russell Savage, Kwame Alatunji, Gordon Graham, Mitchell Witten, and Charlie Kaye. Stephen Saxon had arranged to provide transportation for teammates James Boland, Thomas Lincoln, Scott Coolidge, and Andrew Puopolo. His car was parked on Boylston Street near the establishment known as the Copper Skillet.

As Stone and the accompanying students headed toward the van, they encountered two black women on Boylston Street. Sexual favors were discussed. The two women accompanied the group to the van. The women stayed at the van momentarily. When they had left, Charlie Kaye found that his wallet was missing. Suspecting that the women had taken it, he and his teammates jumped from the van and pursued them. At the entrance of Bumstead Court, an alley off Boylston Street and adjacent to the Carnival Lounge, their path was blocked by a black man, codefendant Allen, the "bouncer" at the Carnival Lounge. The football players returned to their van, got in and pulled up to Boylston Street. About this time, Saxon and those he was to drive home were on their way to Saxon's car.

As the van proceeded east on Boylston Street, one of the football players inside the van saw one of the black women walking west on Boylston Street. He shouted, "There she goes." One of the players jumped out of the van to pursue her. The van pulled into an alleyway next to the Silver Slipper Bar, and the rest of the football players jumped out to give chase. The woman was stopped by three other football players who were standing on Boylston Street. She screamed and ran toward the Tremont Street intersection. The football players from the van and those standing on Boylston Street began running after her. The black woman reached the intersection of Tremont and Boylston Streets as Saxon caught up to and grabbed her. She fell to the pavement. Saxon pulled her to her feet. When she regained her footing she ran away, southward, down Tremont Street toward LaGrange

Street. Suddenly, codefendant Soares, a black man, interceded and knocked Saxon down. Saxon got to his feet as his teammates ran up and confronted Soares. Soares kicked at the nearest, Lincoln, and backed away. Soares backed further across Tremont Street toward the bordering Boston Common sidewalk. The football players advanced toward him.

From the corner diagonally opposite (southeast) codefendant Allen shouted, "You came to the Zone, you got burned. Now clear out of here. Get the hell out of here." The football players continued their advance on Soares. Soares backed up over the curb onto the sidewalk to the front of an MBTA kiosk. He took off his jacket and defied the encircling football players, saying, "Come on. I've been waiting for this." One of the football players, Lincoln, said, "Let's get out of here. This is silly because he doesn't have a wallet." From across Boylston Street a black man in a leather coat (codefendant Easterling) ran forward brandishing a knife, followed by a second man. Stone, standing behind the football players, saw Easterling and shouted, "Get out of here. There's a guy coming over with a knife." Coolidge, facing Soares at a distance of about five or six feet, heard Stone's warning, and assumed it pertained to Soares. He looked down and saw something shining at or near Soares's hand; he could not say, however, that Soares then or later held a knife.

Easterling ran up to Lincoln and stabbed him in the arm and in the abdomen. At this point most of the football players around the MBTA kiosk, and in the intersection, turned and ran back down Boylston Street toward the van. Coolidge helped Lincoln toward Saxon's car.

As to what happened at this point there was conflicting evidence given by the prosecution witnesses. Lincoln testified that as Coolidge helped him walk about fifteen yards down Boylston Street, he looked back up Boylston Street toward the intersection. He observed a white man in a red jacket (who was not identified at the trial), Soares, Easterling, and Allen gather in the intersection

and then follow the football players. Coolidge testified that while at Saxon's car he saw these four men talking, but he stated that he did not recall anything being said. Boland, backing up to the car with Puopolo at the time, stated that there were three to four blacks following just fifteen feet behind him, but he did not testify to any conversation. Witten, just beyond Saxon's car, turned and saw a group of six or seven men, Soares and Allen among them, following the students, just ten to fifteen yards behind the returning group of football players. Saxon stated that he did not see the man in the red coat at the intersection or passing his car. Dutton testified that the man in the red coat was at the Washington Street end of Boylston Street, just before the students returned. Lincoln and Witten testified that the group following them shouted various threats and taunts, including "We're going to cut you white m——— f———," and "We're going to get you now." As the pursuing group reached Saxon, Boland, and Puopolo they passed around them, without incident. When the pursuers reached the van parked in the alley along the side of the Silver Slipper Bar there were about fifteen football players present.

The unidentified man in the red jacket then opened the van door and amid shouts pulled Charlie Kaye, a very big man, out by his tie. General pushing and shoving began, followed by fighting in the parking area next to the van. Soares punched Kaye, and moved about, challenging various football players to fight him. Andrew Puopolo ran down from Saxon's car to the van. Saxon and Boland followed and were confronted by Easterling at the rear of the van. Easterling had his knife out and was asking, "Where you coming from m——— f———?"

Puopolo became involved in a fight at the right front of the van. Boland testified that Puopolo's opponent was Easterling. Savage testified that the opponent was Allen. However, DeCamp testified that it was Soares, which testimony was corroborated by Saxon, Witten, and Coolidge.

Puopolo and Soares, standing near the front right bumper of the van, began trading blows. There was a shout of "It's one on one," attributed to Allen. Puopolo and Soares fought, trading blows, in front of the van, and around and between the van and the wall of the Silver Slipper Bar. Easterling went along the passenger's side of the van, around the front and between the van and the wall. When Soares and Puopolo emerged from between the wall of the Silver Slipper Bar and the van out onto the sidewalk, Easterling was on top of them. As Soares was wrestling with Puopolo, Easterling struck over Soares's shoulder with his knife, apparently cutting Soares's knuckle and Puopolo's chest and arm. The three tumbled out onto the sidewalk behind the van and under a car. Puopolo broke free and stood up. Puopolo then traded punches with Soares who pushed him up against the front wall of the Silver Slipper Bar. Coolidge pulled Puopolo off and looked down at Puopolo's shirt. It was bloody. Puopolo said "I'm all right. Let's get out of here." They moved to leave.

At that moment Officers Geary and Carroll drove their cruiser onto Boylston Street from Washington Street. Geary testified that as the disturbance came into view, he saw a black man, identified by his hat as Soares, striking the victim with a side-arm motion. Coolidge testified that after Puopolo and Soares separated, Easterling shouted at Puopolo. Puopolo turned toward Easterling who met him and stabbed him in the chest. Easterling backed off as Puopolo and Coolidge staggered away east down Boylston Street toward Washington Street. Soares and Easterling moved along the sidewalk further up Boylston Street. They turned and started walking up Boylston Street toward Tremont Street. Officer Geary got out of the police car and shouted at them. The officer began running after them. They then started to run up Boylston Street toward Tamworth, an alleyway. Easterling ran down Tamworth and escaped, but Soares stumbled and the officer overtook him. Soares was taken back to the cruiser and was searched. There was no weapon.

Testimony was admitted that, while Soares was in custody in the cruiser, Allen stated to the police officer, "Let him alone. He didn't do anything." Whereupon the Harvard football players pointed at Allen and said that he was one of the assailants. He was arrested. Soon thereafter the police apprehended Easterling. Soares was taken to the Massachusetts General Hospital to have his knuckle treated. Puopolo was taken to the New England Medical Center where he was treated for massive chest wounds from which he died on December 17, 1976.

The prosecution's theory for the indictments of murder in the first degree was that the defendants engaged in a joint enterprise to commit murder with deliberate premediation and malice aforethought. Specifically, it claimed that either Easterling or Soares struck the fatal blow and that the other of the two, with Allen, aided and abetted in the killing. See G. L. c. 274, § 2.[3]

Easterling argues that the evidence shows only that he intended to disperse the football players and to protect Soares, and that, in any case, he lacked the time and opportunity for deliberate premeditation. Soares argues that he engaged in mutual combat only, that the evidence cannot support an inference that he stabbed Puopolo or that he associated with Easterling in a scheme which contemplated murder. Lastly, Allen maintains that his acts fail to evince association with a criminal enterprise at any level. We consider each defendant and the relevant evidence separately.

*a.* To prove deliberate premeditation the Commonwealth must show that a defendant's resolution to kill was a result of reflection which "is not so much a matter of time as of logical sequence. First the deliberation and premeditation then the resolution to kill, and lastly the

---

[3] General Laws c. 274, § 2, as appearing in St. 1973, c. 529, § 1, provides: "Whoever aids in the commission of a felony, or is accessory thereto before the fact by counselling, hiring or otherwise procuring such felony to be committed, shall be punished in the manner provided for the punishment of the principal felon."

killing in pursuance of the resolution; and all this may occur in a few seconds." *Commonwealth* v. *Tucker,* 189 Mass. 457, 495 (1905). The evidence amply permits the inference that Easterling stabbed the victim with deliberate premeditation. The following facts support this inference: Easterling brought a dangerous weapon into the brawl, see *Commonwealth* v. *Caine, 366* Mass. *366,* 374 (1974); he had used it twice (on Lincoln and then Puopolo) before striking the fatal blow; his attack on Puopolo followed a pause in the altercation during which he conferred with the other defendants and pursued the fleeing football players 225 feet from Tremont Street to the van; he made various threats "to cut" the victim; and he stabbed the victim with great force while the victim attempted to disengage from the combat, see *Commonwealth* v. *Watkins,* 373 Mass. 849, 851 (1977); *Commonwealth* v. *McLaughlin,* 352 Mass. 218, 230-231, cert. denied, 389 U.S. 916 (1967). The judge did not err in denying Easterling's motion for a directed verdict.

*b.* Without considering whether the evidence supports an inference that Soares stabbed Puopolo, we conclude that the evidence of a joint enterprise to commit murder in the first degree warranted the judge's submission of the issue to the jury. The theory underlying joint enterprise is that one who aids, commands, counsels, or encourages commission of a crime while sharing with the principal the mental state required for the crime is guilty as a principal. See, e.g., *Commonwealth* v. *Blow,* 370 Mass. 401, 407-408 (1976); *Commonwealth* v. *Richards, 363* Mass. 299, 307-308 (1973). The jury may infer the requisite mental state from the defendant's knowledge of the circumstances and subsequent participation in the offense. See *Commonwealth* v. *Ferguson,* 365 Mass. 1 (1974). Here there was evidence sufficient to warrant a finding that as Soares pursued the students to the van, he knew that Easterling had a knife and was acting on a premeditated design to kill. Compare *Commonwealth* v. *Scanlon,* 373 Mass. 11, 16-17 (1977), with *Commonwealth* v. *Clark,*

363 Mass. 467 (1973). Cf. *Commonwealth* v. *Podlaski, ante* 339, 347 (1979); Commonwealth v. *Monsen, ante* 245, 253-255 (1979). At the confrontation on Tremont Street, the football players standing within five or six feet of Soares had heard Stone's warning that a man with a knife was fast approaching; Easterling then stabbed Lincoln in the arm and abdomen; and as the defendants chased the students down Boylston Street, they shouted taunts of, "We have knives," and "We're coming to cut you whiteys." The stabbing of Lincoln gives meaning to these statements. Particularly significant is the evidence that Soares conferred with a group including Easterling before instigating the encounter resulting in Puopolo's death. The jury could have inferred from the prior events, the meeting and conversation, that an agreement had been reached to commit the acts that followed. See *Commonwealth* v. *Blow, supra* at 407. There is therefore sufficient evidence from which to conclude that Soares neither accidentally nor unknowingly associated with an enterprise that contemplated an intentional killing. Denial of his motion for a directed verdict was not error.

*c.* There is little question that the jury could deem Soares an abettor in the murder of Puopolo; he fought Puopolo up to the moment Easterling did the stabbing. See *Commonwealth* v. *Perry,* 3 Mass. App. Ct. 308, 313-314 (1975). Allen, on the other hand, argues that because he did not fight the victim[4] or anyone else, he did not participate in the joint venture. It is true that presence with knowledge of the planned act is insufficient alone to convict a person for the acts of another. See, e.g., J. R. Nolan, Criminal Law § 622 (1976). However, if an individual is, by agreement, in a position to render aid, he is an abettor

[4] There was testimony that Allen may have grappled with Puopolo before Puopolo fought with Soares. Allen claims that because this testimony was false, misleading, and based on a mistaken identification, its use by the prosecution constitutes error. While we do not rely on the challenged testimony, the argument is without merit. The resolution of conflicting testimony is properly left to the jury.

even if he does not participate in the actual perpetration of the crime, "[f]or the presence of the abettor under such circumstances, must encourage and embolden the perpetrator to do the deed, by giving him hopes of immediate assistance." *Commonwealth* v. *Knapp*, 9 Pick. 495, 518 (1830). See *Commonwealth* v. *Perry*, 357 Mass. 149, 151 (1970); *Commonwealth* v. *Gallagher*, 4 Mass. App. Ct. 661, 664 (1976). Here, it could be concluded that Allen was more than a mere onlooker. There was evidence that he and the other defendants were known to each other, that Allen was the first of the defendants to confront the students as he prevented them from chasing the women who had allegedly taken Charlie Kaye's wallet; that all three engaged in a common purpose to protect the two prostitutes and preclude recovery of the wallet stolen from Kaye; that he was present as Easterling stabbed Lincoln and thereafter challenged Lincoln to fight; that he conferred with Easterling and Soares at Tremont and Boylston Streets and then pursued the students to the van; that he stood guard at the entrance of the alley once they reached the van; and that he shouted, "It's one on one," as Soares and Puopolo began to fight. Like Soares, Allen could be found to have known that Easterling had a knife and intended to use it. The evidence therefore permits the inference that Allen had knowledge of the scheme, and by agreement positioned himself to protect his acquaintances Soares and Easterling as they did battle, to assist them in making an escape and generally to help them meet any eventuality. Consequently, there was no error in the denial of Allen's motion.

We turn now to a consideration of the claim of error which in our view is dispositive of this appeal, namely the issue raised by the assignments of error dealing with the alleged denial of the rights of the defendants to a trial by an impartial jury.[5]

---

[5] We need not reach the other assignments of error argued before us as the issues raised thereby are not likely to recur on a retrial.

2. *Improper Use of Peremptory Challenges.*

The defendants Soares, Allen, and Easterling are black. The victim of the murder for which they were tried was white, as were the victims of the assaults alleged. At the jury empanelment, thirteen black members of the venire were found to be indifferent by the judge, G. L. c. 234, §§ 26, 26B, 28, and were available to be seated as jurors. The prosecutor peremptorily challenged twelve of these.[6] One black man was not challenged, was seated, and was designated by the judge as foreman of the jury.

The prosecutor exercised a total of forty-four peremptory challenges. Through his use of these challenges, he excluded ninety-two per cent of the available black jurors, and only thirty-four per cent of the available white jurors.[7] The defendants Easterling and Allen claim that by virtue of this systematic use of peremptory challenges to eliminate all but one black from the jury, the prosecutor effectively deprived them of their constitutional right to a fair trial, and their right to be tried by an impartial jury, in violation of arts. 12 and 15 of the Declaration of Rights of the Massachusetts Constitution.[8]

---

[6] Peremptory challenges are provided for by G. L. c. 234, § 29. Each of the defendants had sixteen peremptory challenges, and the prosecution, under the statute, had forty-eight. The procedure for the exercise of peremptory challenges is set forth in Rule 6 of the Superior Court (1974). Cf. Mass R. Crim. P. 20(c) (effective July 1, 1979).

[7] Thirty-two of the ninety-four available white jurors were challenged by the Commonwealth.

[8] The defendants carefully laid the foundation for appeal with regard to this issue. Each time a prospective black juror was challenged by the prosecution, they noted for the record the race of that individual, objected to the prosecutor's use of the peremptory challenge, and took exception to the judge's refusal to sustain their objection.

The defendants also attempted to be heard more fully on this matter during empanelment but were unsuccessful. After the first black had been challenged by the Commonwealth, counsel for the defendant Allen tried to make what he characterized as an offer of proof:

COUNSEL FOR THE DEFENDANT ALLEN: "If it develops during the course of the selection of the jury that [the prosecutor] systematically challenges black jurors through the use of peremptory challenges,

The Commonwealth asserts that the standards enunciated in *Swain* v. *Alabama*, 380 U.S. 202 (1965), should be incorporated into the Massachusetts Constitution.[9]

your Honor, I would like to make an offer of proof at that time, and I would take exception to it, and I would direct the Court's attention to—"

THE JUDGE: "Well, you're familiar with the decisions in that area?"

COUNSEL FOR THE DEFENDANT ALLEN: "Correct, your Honor, and I would—"

THE JUDGE: "Wait a minute. So far as I'm concerned, if I were sitting down there, either on the prosecution or the defense, I would have challenged that person on the basis of his lack of intelligence."

COUNSEL FOR THE DEFENDANT ALLEN: "Please note my exception on behalf of the defendant Allen."

When the prosecutor had challenged the second prospective black juror, counsel for the defendant Allen objected and said:

COUNSEL FOR THE DEFENDANT ALLEN: "And again, your Honor, it is my position that—"

THE JUDGE: "I don't care what your position is. You've noted your exception, and that's it. I'm not going to have any more speeches about that, and I'll see you in the lobby at one o'clock."

At the lobby conference, the judge made his position clear:

THE JUDGE: "Now, you look here, Mr. Owens. Sit down for just a moment. I've got something to say to you on the record. I'm not going to have any injection of racial prejudice into this case if I can prevent it, and I want you making no speeches out there. The law is clear in recognizing the purpose of peremptory challenges. You've already got it on the record in respect of your position, and I don't want it being repeated any more . . . ."

Finally, after twelve of the thirteen black veniremen called had been challenged by the Commonwealth, the defendant requested a hearing on the matter.

COUNSEL FOR THE DEFENDANT ALLEN: "Your Honor, if the Court were to conduct a hearing at this time directed to the District Attorney to find out if any of the peremptory challenges exercised by him were in any manner used to exclude black people from this jury—"

THE JUDGE: "Do you wish to reply to that Mr. [prosecutor]?"

THE PROSECUTOR: "No, your Honor."

THE JUDGE: "Very well. Denied and your exception is saved."

[9] See, e.g., *Commonwealth* v. *Mitchell*, 367 Mass. 419 (1975); *Commonwealth* v. *Talbert*, 357 Mass. 146 (1970). In none of these cases did we have occasion to examine the claim made here that the Massachusetts Constitution mandates a standard other than that set forth in *Swain* v. *Alabama*, 380 U.S. 202 (1965). In *Commonwealth* v. *King*, 366 Mass. 6 (1974), we rejected an invitation to formulate a new rule under our supervisory powers. G. L. c. 211, § 3.

The Commonwealth argues no error was shown on this record under the *Swain* standards, and urges us to follow our prior decisions adhering to *Swain.*

In *Swain,* five Justices of the Supreme Court joined in holding that the striking of black persons from the jury in a particular case did not violate the equal protection clause of the Fourteenth Amendment to the United States Constitution. The Court stated: "The presumption in any particular case must be that the prosecutor is using the State's challenges to obtain a fair and impartial jury to try the case before the court. The presumption is not overcome and the prosecutor therefore subjected to examination by allegations that in the case at hand all Negroes were removed from the jury or that they were removed because they were Negroes." *Id.* at 222. While the practice of removing blacks from a particular jury was found insulated from inquiry "on the assumption that the prosecutor is acting on acceptable considerations related to the case he is trying, the particular defendant involved and the particular crime charged," *id.* at 223, the Court implied that it would entertain an equal protection challenge in some circumstances. This might occur when "in case after case, whatever the circumstances, whatever the crime and whoever the defendant or the victim may be," the prosecutor "is responsible for the removal of Negroes who have been selected as qualified jurors by the jury commissioners and who have survived challenges for cause, with the result that no Negroes ever serve on petit juries."[10] *Id.*

---

[10] The defendants have not attempted to present evidence which would be sufficient to make out a prima facie equal protection violation under *Swain* v. *Alabama,* 380 U.S. 202 (1965). Indeed, every defendant who has tried to rebut the *Swain* presumption of prosecutorial propriety has found it to be an illusory goal, in both the Federal and State courts. See Annot., 79 A.L.R.3d 56-73, Use of Peremptory Challenges to Exclude from Jury Persons Belonging to a Class or Race (1977); Hayden, Senna & Siegel, Prosecutorial Discretion in Peremptory Challenges: An Empirical Investigation of Information Use in the Massachusetts Jury Selection Process, 13 New England L. Rev. 768

The *Swain* approach advocated by the Commonwealth is doubtless attractive in its simplicity. If followed, it would permit us to approve without further scrutiny the prosecutor's exercise of peremptory challenges in this case, as comporting with the Fourteenth Amendment. The defendants suggest, however, that consideration of the discriminatory use of peremptory challenges should not begin and end with *Swain*.[11] Rather, they propose

(1978). Not the least of the impediments to establishing such a claim is the nature of the proof required to establish systematic exclusion by the prosecutor. It is doubtful that many jurisdictions maintain comprehensive records of peremptory challenges, let alone information regarding the race of those individuals challenged. Nor does Massachusetts maintain such records. See Note, Limiting the Peremptory Challenge: Representation of Groups on Petit Juries, 86 Yale L.J. 1715, 1723 (1977) (hereinafter, Limiting the Peremptory Challenge). The defendants here, having declined to take up the Sisyphean burdens imposed on persons asserting a violation of equal protection under *Swain*, have chosen to argue that the Declaration of Rights of the Massachusetts Constitution provides an alternate route to relief. Compare *South Dakota* v. *Opperman*, 428 U.S. 364 (1976), with *State* v. *Opperman*,     S.D.     (1976) (247 N.W.2d 673 [1976]). We note, however, that the five cases that have come before us where the issue has been raised, by a variety of defense counsel, albeit unsuccessfully, see notes 9 *supra*, and 12 *infra*, all come from Suffolk County. That these five cases may not fully represent the extent of the alleged practice is suggested by *Commonwealth* v. *Flowers*, 5 Mass. App. Ct. 557, 569 (1977) (Brown, J., concurring). Justice Brown noted in that case (also from Suffolk county) that the trial judge had declared a mistrial during the selection of the jury because "[t]he assistant district attorney was at that time engaging in that much too often used practice of peremptorily challenging all potential black jurors when the defendant is black." *Id.* at 570. Cf. *Commonwealth* v. *Anderson*, 3 Mass. App. Ct. 463 (1975) (Suffolk County; black defendant, white victim; prosecutorial peremptory challenges caused all white jury); *Commonwealth* v. *Cranshaw*, 4 Mass. App. Ct. 630 (1976) (Hampden County; prosecutor peremptorily challenged all three black veniremen; all white jury).

[11] Since its release in 1965, *Swain* has been the subject of extensive and biting criticism. See Martin, The Fifth Circuit and Jury Selection Cases: The Negro Defendant and his Peerless Jury, 4 Hous. L. Rev. 448 (1966); Note, The Supreme Court, 1964 Term, 79 Harv. L. Rev. 103, 135-139 (1965); Comment, *Swain* v. *Alabama*: A Constitutional Blueprint for the Perpetuation of the All-White Jury, 52 Va. L. Rev. 1157 (1966); Note, Fair Jury Selection Procedures, 75 Yale L.J. 322 (1965);

that the protections offered by the right to trial before a
jury of peers, guaranteed by art. 12, provide an alternate
basis for examination of the prosecutor's use of perempto-
ry challenges in this case to exclude twelve of thirteen
eligible black jurors. We accept the invitation to reexam-
ine the issue, recognizing that it previously has not been
explored by the court within this framework.[12]

The defendants rely primarily on art. 12. That provi-
sion states in pertinent part: "And no subject shall be
arrested, imprisoned, despoiled, or deprived of his proper-
ty, immunities, or privileges, put out of the protection of
the law, exiled, or deprived of his life, liberty, or estate,
but by the judgments of his peers, or the law of the land."

Note, Peremptory Challenge—Systematic Exclusion of Prospective
Jurors on the Basis of Race, 39 Miss. L.J. 157 (1967); Note, The Jury:
A Reflection of the Prejudice of the Community, 20 Hastings L.J. 1417
(1969); Comment, A Case Study of the Peremptory Challenge: A Subtle
Strike at Equal Protection and Due Process, 18 St. Louis U.L.J. 662
(1974); Comment, The Prosecutor's Exercise of the Peremptory Chal-
lenge to Exclude Nonwhite Jurors: A Valued Common Law Privilege
in Conflict with the Equal Protection Clause, 46 U. Cin. L. Rev. 554
(1977); Recent Development, Racial Discrimination in Jury Selection,
41 Alb. L. Rev. 623 (1977); Limiting the Peremptory Challenge, *supra.*

[12] See our comment in note 9, *supra.* In addition to the cases cited
in note 9, *supra,* see *Commonwealth* v. *Johnson,* 372 Mass. 185, 198
(1977); *Commonwealth* v. *Cook,* 364 Mass. 767, 770 (1974). In light of
the extensive criticism of *Swain,* and in recognition of the negligible
protection that decision offers to a defendant asserting the right to
trial by jury of peers, we take this opportunity to depart from applying
its rule perfunctorily, and choose instead to examine this problem
from a new vantage point.

We are especially aided in this endeavor by the California Supreme
Court's recent decision in *People* v. *Wheeler,* 22 Cal. 3d 258 (1978),
which has broken much of the ground for us. In *Wheeler,* two black
men were convicted of murdering a white store owner in the course
of a robbery. Although several blacks had been summoned to the jury
box and had been found indifferent, the prosecutor eliminated each of
them through his use of peremptory challenges, and thereby obtained
an all white jury. The California high court reversed the convictions
on the basis that the prosecution's actions violated the right to an
impartial jury representative of a cross section of the community, as
guaranteed by the California Constitution, art. I, § 16, which provides:
"Trial by jury is an inviolate right and shall be secured to all . . . ."

Previous cases decided by this court delineate the char-
acteristics of the jury contemplated by art. 12. In various
contexts, we have remarked that "[a] fair jury is one that
represents a cross section of community concepts," *Com-
monwealth* v. *Ricard*, 355 Mass. 509, 512 (1969); "[it] is
part of the established tradition in the use of juries as
instruments of public justice that the jury be a body truly
representative of the community," *Commonwealth* v.
*Martin*, 357 Mass. 190, 191 (1970), quoting from *Smith* v.
*Texas*, 311 U.S. 128, 130 (1940); "[a] defendant is constitu-
tionally entitled to a jury selection process free of dis-
crimination against his grouping in the community . . .,"
*Commonwealth* v. *Rodriquez*, 364 Mass. 87, 92 (1973).[13]

The mandate that a jury be drawn from a fair and
representative cross section of the community is hardly
unique to Massachusetts law. The United States Supreme
Court has frequently affirmed this concept.[14] In *Taylor* v.
*Louisiana*, 419 U.S. 522, 528 (1975), the Court held that
"the selection of a petit jury from a representative cross
section of the community is an essential component of the
Sixth Amendment right to a jury trial."[15] In *Taylor*, the

[13] This concept has been recognized by our Legislature most recently
by G. L. c. 234A, § 1, inserted by St. 1977, c. 415, § 2, applicable to
Middlesex County, which provides in § 1 thereof: "All persons selected
for juror service on grand and trial juries in Middlesex county shall
be selected at random from a fair and randomly drawn cross-section
of the population of the particular judicial district in which they re-
side. All citizens shall have equal opportunity to be considered for
juror service. All citizens shall be legally obligated to serve as jurors
when selected and summoned for that purpose. No citizen shall be
excluded or exempted from serving as a grand or trial juror in Middle-
sex county because of race, color, religion, sex, national origin, eco-
nomic status, or occupation."

[14] See, e.g., *Smith* v. *Texas*, 311 U.S. 128 (1940) (grand jury); *Thiel*
v. *Southern Pac. Co.*, 328 U.S. 217 (1946) (trial jury); *Ballard* v. *United
States*, 329 U.S. 187 (1946) (jury venire); *Peters* v. *Kiff*, 407 U.S. 493
(1972) (grand and petit jury). See *Peters, supra* at 497 nn.6-8, for a
citation of authorities that this right extends to grand juries, petit
juries, or both.

[15] *Duncan* v. *Louisiana*, 391 U.S. 145 (1968), had previously applied
the Sixth Amendment right to jury trial to the States under the Four-

Court reversed a State conviction of a male defendant on the ground that women had been effectively excluded from jury service.[16] Recognizing that "excluding identifiable segments playing major roles in the community cannot be squared with the constitutional concept of jury trial," *id.* at 530, the Court focused on the rights of the individual defendant in any particular trial.[17]

The right to be tried by a jury drawn fairly from a representative cross section of the community is critical for a variety of reasons. Acknowledging that "[t]he purpose of a jury is to guard against the exercise of arbitrary power — to make available the commonsense judgment of the community as a hedge against the overzealous or mistaken prosecutor and in preference to the profession-

---

teenth Amendment. Since we base our decision here on the Massachusetts Constitution, we do not undertake consideration of whether the authority of *Swain* is undermined by *Duncan* or by such decisions as *Taylor*, or *Peters*, *supra.*

[16] The Louisiana Constitution and Code of Criminal Procedure both provided that a woman should not be selected for jury service unless she had previously filed a written declaration of her desire to be subject to jury service.

[17] We note that both *Taylor* and *Peters* make clear that a defendant need not be a member of the excluded group to assert such a right. The distinction between the emphasis in *Taylor* on defining each individual's right to jury trial (under the Sixth Amendment) and the concern in *Swain* with the systematic exclusion of a racial group from juries over a period of time (under the Fourteenth Amendment) is significant. *Swain* furnishes no protection whatsoever to a defendant who is the victim of a consistent prosecutorial policy of total exclusion of blacks through use of peremptory challenges, if he happens to be tried before an extended pattern of abuse becomes apparent. As has been discussed above, even the protections which *Swain* purports to provide are more illusory than real, since the barriers to showing an equal protection violation on account of such exclusionary practices over a period of time have proved to be insuperable. See note 10 *supra. Taylor*, on the other hand, focuses on the Sixth Amendment right of *each* defendant to be tried before a properly constituted jury. Article 12 of the Declaration of Rights of the Massachusetts Constitution calls on us to engage in at least as probing a scrutiny of trials conducted in the Commonwealth.

al or perhaps overconditioned or biased response of a judge, *Duncan* v. *Louisiana*, 391 U.S., at 155-156," the *Taylor* Court also recognized that "[t]his prophylactic vehicle is not provided if the jury pool is made up of only special segments of the populace or if large, distinctive groups are excluded from the pool." *Taylor* v. *Louisiana*, *supra* at 530. The Court continued: "Community participation in the administration of the criminal law, moreover, is not only consistent with our democratic heritage but is also critical to public confidence in the fairness of the criminal justice system. Restricting jury service to only special groups or excluding identifiable segments playing major roles in the community cannot be squared with the constitutional concept of jury trial. '. . . [T]he broad representative character of the jury should be maintained, partly as assurance of a diffused impartiality and partly because sharing in the administration of justice is a phase of civic responsibility.' *Thiel* v. *Southern Pacific Co.*, 328 U.S. 217, 227 (1946) (Frankfurter, J., dissenting)." *Taylor, supra* at 530-531.[18]

The "assurance of a diffused impartiality" is a key objective sought to be furthered by the requirement of a representative cross section of the community. In *Peters* v. *Kiff*, 407 U.S. 493, 503-504 (1972), a white defendant was deemed to have standing to raise this issue and his conviction was reversed as violative of the due process clause[19] on the basis that blacks had been systematically excluded from his grand and petit juries in State court. Mr. Justice Marshall stated that "[w]hen any large and identifiable segment of the community is excluded from

[18] The Supreme Court of California, in *People* v. *Wheeler, supra*, relied on such considerations and added that "the representative cross-section rule also serves other essential functions in our society, such as legitimating the judgments of the courts, promoting citizen participation in the government, and preventing further stigmatizing of minority groups." *Id.* at 267 n.6.

[19] The Court relied on the due process clause because the defendant had been tried in State court prior to *Duncan* v. *Louisiana, supra*.

jury service, the effect is to remove from the jury room qualities of human nature and varieties of human experience, the range of which is unknown and perhaps unknowable. It is not necessary to assume that the excluded group will consistently vote as a class in order to conclude, as we do, that its exclusion deprives the jury of a perspective on human events that may have unsuspected importance in any case that may be presented.[20]

Despite the crucial importance of the principle of "diffused impartiality," we recognize that the right to a jury representative of a cross section of the community cannot require that each jury include constituents of every group in the population. The impracticability of such a formula is patent. Aside from the fact that no jury of reasonable size could possibly reflect all the distinctive groups in the

---

[20] The significance of these concerns has been widely recognized. The Federal Jury Selection and Service Act of 1968, Pub. L. 90-274, 82 Stat. 53, 28 U.S.C. § 1861 (1976), states: "It is the policy of the United States that all litigants in Federal courts entitled to trial by jury shall have the right to grand and petit juries selected at random from a fair cross section of the community in the district or division wherein the court convenes." The views expressed by the House in its committee report on the bill are instructive: "It must be remembered that the jury is designed not only to understand the case, but also to reflect the community's sense of justice in deciding it. As long as there are significant departures from the cross sectional goal, biased juries are the result—biased in the sense that they reflect a slanted view of the community they are supposed to represent." H.R. Rep. No. 1076, 90th Cong., 2d Sess. 8 (1968), quoted approvingly in *Taylor* v. *Louisiana*, *supra* at 529 n.7. Similar statutory langugage is found in G. L. c. 234A, § 1, quoted in note 13, *supra*.

A recent commentator addresses the issue with even greater specificity: "The absence of a group from petit juries in communities where the group represents a substantial portion of the population may lead to jury decisionmaking based on prejudice rather than reason. For example, a black defendant, faced with an all-white jury, consistently runs a greater risk of conviction, of conviction of a more severe offense, and of harsher punishment than a white defendant. White jurors, satisfied that blacks will never sit in judgment upon themselves or their white neighbors, can safely exercise their prejudices" (citations omitted). Limiting the Peremptory Challenge, *supra* at 1730-1731 & n. 69. Compare the language of the California court in *People* v. *Wheeler, supra* at 266-267.

community, the procedure used in this Commonwealth to choose jury panels from lists of qualified jurors[21] is random selection. See G. L. c. 234, §§ 17-23. Inevitably, some panels drawn by this method will fail to represent proportionately the various groupings in the population.[22] A requirement that each venire be mathematically representative would not only be administratively unfeasible, but would also invite improper manipulation of the panel.

Another reason why absolute proportionality cannot be guaranteed is the proper provision for removal of any prospective juror, whether of a discrete group or not, who has expressed or formed an opinion regarding the case, or has an interest, bias, or prejudice related to the unique situation presented by the case. See G. L. c. 234, § 28. Removal in such cases is clearly appropriate in the interest that persons actually prejudiced not be seated on the jury even if it tends to skew an otherwise balanced panel.[23]

Given these considerations, we refrain, as did the *Taylor* Court, from imposing a requirement that petit juries actually chosen "mirror the community and reflect the various distinctive groups in the population." *Taylor, supra* at 538. It is not enough, however, that there be a representative venire or panel. The desired interaction of a cross section of the community does not occur there; it is only effectuated within the jury room itself. Cf. *United*

---

[21] See G. L. c. 234, §§ 1-4. Of course, these master lists from which the venires are drawn must reflect a representative cross section of the community in order to pass constitutional muster. Cf. *Brunson* v. *Commonwealth*, 369 Mass. 106 (1975). No claim is made that the list involved here was improper.

[22] Of course, *systematic* exclusion of a distinctive group from the venire is prohibited. *Taylor* v. *Louisiana, supra. Commonwealth* v. *Underwood*, 3 Mass. App. Ct. 522 (1975).

[23] The defendant Allen assigned as error the judge's ruling excusing three black jurors for cause, but appears to have waived these assignments.

*States* v. *McDaniels*, 379 F. Supp. 1243, 1244 (E.D. La. 1974) (*Swain* burden not met, but where government peremptory challenges removed six of seven black persons from venire, court allowed motion for new trial under Fed. R. Crim. P. 33 [1978] in "the interest of justice"). We realize that the fair cross section on the petit jury inevitably must be affected by the vicissitudes of the draw and the justifiable exclusion "for cause" discussed thus far, both of which procedures acceptably fall within the limits of art. 12. We must proceed cautiously, however, in considering the permissibility of other incursions into the cross-sectional balance, if "diffused impartiality" in the jury room is to be reasonably assured. It is in this context that we focus on the last stage of the jury selection process, and the one complained of here: the peremptory challenge exercised under the authority of G. L. c. 234, § 29.

At one point in the development of the common law, peremptory challenges were allowed the defendant only, to be used for protection against jurors who appeared to be prejudiced against him.[24] Later, the government's interest in trial by a jury not unfairly biased in favor of acquittal was recognized, and the right of the prosecution to exercise peremptory challenges is now clearly established. See *Swain* v. *Alabama, supra; Hayes* v. *Missouri*, 120 U.S. 68 (1887). The scope of the peremptory challenge traditionally has exceeded that of the challenge for cause.[25] To eliminate those jurors perceived as harboring

[24] See 4 W. Blackstone, Commentaries 353 (1807), wherein the author notes that use of the peremptory challenge also allowed the defendant to remove a juror whom he had offended by an incisive voir dire or by an unsuccessful challenge for cause; J. M. Van Dyke, Jury Selection Procedures Our Uncertain Commitment to Representative Panels 147-151 (1977). See also *Swain* v. *Alabama, supra* at 219: "Although '[t]here is nothing in the Constitution of the United States which requires the Congress [or the States] to grant peremptory challenges,' *Stilson* v. *United States*, 250 U.S. 583, 586 ]1919], nonetheless the challenge is 'one of the most important of the rights secured to the accused.' *Pointer* v. *United States*, 151 U.S. 396, 408 [1894]."

[25] See G. L. c. 234, § 28, enunciating the limited bases for determining that a potential juror "may not stand indifferent" in trials in this Commonwealth.

subtle biases with regard to the case, which were not elicited on voir dire or which do not establish legal cause for challenge, the parties have been permitted to exercise peremptory challenges on no more than the "sudden impressions and unaccountable prejudices we are apt to conceive upon the bare looks and gestures of another." 4 W. Blackstone, Commentaries 353 (1807). The exercise of peremptory challenges is also viewed as the right to reject jurors legally qualified to sit. *Commonwealth* v. *Stone,* 366 Mass. 506, 509 (1974). *Searle* v. *Roman Catholic Bishop of Springfield,* 203 Mass. 493 (1909). *Hayes* v. *Missouri, supra.*

A description of the latitude allowed in the use of peremptory challenges is set forth in *Swain* v. *Alabama, supra.* at 220: "The essential nature of the peremptory challenge is that it is one exercised without a reason stated, without inquiry and without being subject to the court's control." This court often has used similar language. See, e.g., *Commonwealth* v. *Mitchell,* 367 Mass. 419, 420 (1975); *Commonwealth* v. *Stone, supra.* The quoted passage goes too far, however.[26] If the constitutional mandate of a jury which fairly reflects a cross section of the community is to signify more than hollow words in this Commonwealth, we cannot permit the peremptory challenge to be exercised with absolute and unbridled discretion.

---

[26] In fact, this language from *Swain* is inconsistent with other language in the decision. While the Court announced that exercise of peremptory challenges is not subject to judicial control, later in the opinion it stated that if "the purposes of the peremptory challenge are being perverted ... the presumption protecting the prosecutor may well be overcome." *Id.* at 224. Clearly, then, the *Swain* decision recognized that the improper use of peremptory challenges *could* be controlled by the judge. The distinction remaining between the *Swain* approach and our approach here is that we deem it necessary to examine whether the purposes of the peremptory challenge are being perverted in any particular trial, while the concern in *Swain* was only with an extended pattern of abuse by a particular prosecutorial office.

In fashioning a balance between the goal of diffused impartiality in the petit jury and the limitations inherent in a feasible and fair process of jury selection, we preserve a legitimate and significant role for the peremptory challenge. Toward the end of "eliminat[ing] extremes of partiality on both sides," and of assuring the parties "that the jurors before whom they try the case will decide on the basis of the evidence placed before them, and not otherwise," *Swain, supra* at 219, peremptory challenges may be used to eliminate prospective jurors whose unique relationship to the particular case raises the spectre of individual bias.[27] Both parties retain wide discretion to exercise peremptory challenges in this manner.[28]

---

[27] "For example, a prosecutor may fear bias on the part of one juror because he has a record of prior arrests or has complained of police harassment, and on the part of another simply because his clothes or hair length suggest an unconventional lifestyle. In turn, a defendant may suspect prejudice on the part of one juror because he has been the victim of crime or has relatives in law enforcement, and on the part of another merely because his answers on voir dire evince an excessive respect for authority." *People* v. *Wheeler, supra* at 275.

In a similar vein, a commentator has approved the removal of a venireman who is a taxi cab driver in the prosecution of another taxi cab driver for reckless driving: "[a]nd so, in removing a cab driver from the panel, the prosecutor is eliminating a person likely to favor the defense in order to secure a non-cab driver who is likely to be neutral. It is a choice, in general, between a hostile juror and an impartial one." Kuhn, Jury Discrimination: The Next Phase, 41 S. Cal. L. Rev. 235, 290 (1968). *Commonwealth* v. *Mutina*, 366 Mass. 810, 819-820 (1975).

[28] We have recognized, in another context, the interrelationship of the exercise of challenges for cause and peremptory challenges as a "system" designed to produce an impartial trial jury. We stated in *Commonwealth* v. *Mutina*, 366 Mass. 810, 817-819 (1975): "Jurors do not come to their temporary judicial service as sterile intellectual mechanisms purged of all those subconscious factors which have formed their characters and temperaments such as racial or ethnic background, sex, economic status, intellectual capacity, family status, religious persuasion, political leanings, educational attainment, moral convictions, employment experience, military service or their individual appreciations of the social problems of the moment.

"Indeed, this court has recognized that such factors can affect the intellectual judgments of a juror without any consciousness of bias or

What we view art. 12 of the Declaration of Rights as proscribing is the use of peremptory challenges to exclude prospective jurors solely by virtue of their membership in, or affiliation with, particular, defined groupings in the community.[29] Were we to decline so to hold, we would leave the right to a jury drawn from a representative cross section of the community wholly susceptible to nullification through the intentional use of peremptory challenges to exclude identifiable segments of that community. The argument sometimes made that members of specific identified groups in the community are statistically more likely than the population at large to hold a given view which might bear on their deliberations in the case misapprehends the issue.[30] It is this very diversity of

prejudice and, for this very reason, has supported the jury system—which provides a fair cross section of the community—as the best protection against possible abuse or failure of judgment by even best intentioned individuals.

. . . .

"Despite his good will, maturity, acumen and sense of civic responsibility and despite his willingness to accept and his efforts to apply judicial instructions, the juror comes to the court room complete with that knowledge and those experiences, expectations, fears and frustrations which have shaped his character and attitudes. Quite apart from questions of obvious bias or admitted prejudice, no juror enters into his temporary judicial service stripped of his background and emotions. To hold otherwise would be to defy human experience. Indeed, the recognition of this fact underlies our system of peremptory challenges and challenges for cause."

In our view, what is involved here is an apparent perversion of a system designed to preclude prejudice. See note 31 infra. In short, we criticize not the statute, G. L. c. 234, § 29, allowing peremptory challenges but the use of these statutory rights in the circumstances of this case. Nor should anything we say here be viewed as an opinion on whether the Legislature may substitute another "system" to achieve the same constitutionally mandated result of an impartial trial jury.

[29] The groups of which we speak are defined in art. 1 of the Declaration of Rights of the Constitution of the Commonwealth, as amended by art. 106. See text and note 33, infra.

[30] See People v. Wheeler, supra at 276-277 n.17, quoting from Limiting the Peremptory Challenge, supra at 1733 n.77: "It may be argued that the exclusion of jurors on the basis of group membership would be acceptable where it is believed that, for example, blacks are consist-

opinion among individuals, some of whose concepts may well have been influenced by their group affiliations, which is envisioned when we refer to "diffused impartiality." No human being is wholly free of the interests and preferences which are the product of his cultural, family, and community experience. Nowhere is the dynamic commingling of the ideas and biases of such individuals more essential than inside the jury room.

In the case before us, three black defendants were convicted of the murder of a white man by a jury from which twelve of thirteen eligible blacks had been excluded by the prosecution. We cannot assume that the elimination of black jurors would produce an "impartial" jury. The opposite result is just as probable. Assuming that "group bias" does operate in some fashion, white jurors are equally likely to be sympathetic to a white victim.[31] Given an unencumbered right to exercise peremptory challenges, one might expect each party to attempt to eliminate members of those groups which are predisposed to-

---

ently more biased in favor of acquittal than whites. The argument misses the point of the right to an impartial jury under *Taylor*. Blacks may, in fact, be more inclined to acquit than whites. The tendency might stem from many factors, including sympathy for the economic or social circumstances of the defendant, a feeling that criminal sanctions are frequently too harshly applied, or simply an understandable suspicion of the operations of government. Whites may also be more inclined to convict, particularly of crimes against a white victim. But these tendencies do not stem from individual biases related to the peculiar facts or the particular party at trial, but from differing attitudes toward the administration of justice and the nature of criminal offenses. The representation on juries of these differences in juror attitudes is precisely what the representative cross section standard elaborated in *Taylor* is designed to foster."

[31] One commentator has remarked that "[i]f the prosecutor may reasonably suppose that the Negro juror may be sympathetic to the Negro defendant, by the same token we must assume that a white juror may be sympathetic to the white victim. When the the prosecutor challenges a Negro in order to get a white juror in his place, he does not eliminate prejudice in exchange for neutrality; . . . [He] is, in fact, willy nilly taking advantage of racial divisions to the detriment of the defendant." Kuhn, Jury Discrimination, *supra* at 290-291.

ward the opposition. However, when the defendant is a
minority member, his attempt is doomed to failure. The
party identified with the majority can altogether elimi-
nate the minority from the jury, while the defendant is
powerless to exclude majority members since their num-
ber exceeds that of the peremptory challenges available.
The result is a jury in which the subtle group biases of the
majority are permitted to operate, while those of the
minority have been silenced.[32]

To recapitulate: exercise of peremptory challenges to
exclude members of discrete groups solely on the basis of
bias presumed to derive from that individual's member-
ship in the group, contravenes the requirement inherent
in art. 12 of the Declaration of Rights. In so holding, we
recognize that no defendant is entitled to a petit jury
proportionally representing every group in the communi-
ty; nor are members of particular groups insulated from
the proper use of peremptory challenges to exclude any
individual on any other ground. What both parties are
constitutionally entitled to expect is "a petit jury that is
as near an approximation of the ideal cross-section of the
community as the process of random draw permits." *Peo-
ple* v. *Wheeler, supra* at 277.

Having identified the right to a peer jury as including
the assurance that peremptory challenges will not be ex-
ercised so as to exclude members of discrete groups sim-
ply by virtue of that affiliation, we need define those
discrete groups. Further discussion is hardly required to
establish that blacks constitute a discrete group. We view
the Equal Rights Amendment[33] as definitive, in delineat-

[32] One need not eliminate 100% of minority jurors to achieve an
impermissible purpose. If the minority's representation is reduced to
"impotence," as, for example, by the challenge of a disproportionate
number of group members, and the failure to challenge only a minori-
ty member who can reasonably be relied on as "safe," the majority
identified biases are likely to meet little resistance, and the represen-
tative cross section requirement is not fulfilled. See Kuhn, Jury Dis-
crimination, *supra* at 287 n.213.

[33] Article 1 of the Declaration of Rights of the Constitution of the

ing those generic group affiliations which may not permissibly form the basis for juror exclusion: sex, race, color, creed or national origin.

We now examine the mechanics incident to the effectuation of that guaranty.[34] We begin with the presumption of proper use of peremptory challenges. That presumption is rebuttable, however, by either party[35] on a

Commonwealth, as amended by art. 106, adopted in 1976, states in pertinent part: "Equality under the law shall not be denied or abridged because of sex, race, color, creed or national origin."

[34] We note that the Massachusetts Rules of Criminal Procedure (effective July 1, 1979) make no provision for such procedures, nor could this be expected in light of our prior adherence to the *Swain* approach in this area of law. It well may be that appropriate rules should be promulgated. In the interim, because of the importance of the rights involved and because of our desire to give guidance to the trial bar and to trial judges, we feel it more appropriate to follow the practice adopted in *Commonwealth* v. *Stewart*, 365 Mass. 99, 105 (1974). See *Blaisdell* v. *Commonwealth*, 372 Mass. 753 (1977); cf. Mass. R. Crim. P. 14(b)(2); *Commonwealth* v. *Edgerly*, 372 Mass. 337 (1977); cf. Mass. R. Crim. P. 14(b)(1). Additionally, it may be desirable to study the experience which develops in the application of the present decision—experience with challenges, for cause and peremptory, and with judicial reactions—as a basis for formulating rules of court. See *Commonwealth* v. *A Juvenile*, 365 Mass. 421, 441 (1974) (Quirico, J., dissenting); *id.* at 452 (Kaplan, J., dissenting). See also *Commonwealth* v. *Vitello*, 376 Mass. 426, 464 (1978) (Kaplan, J., concurring).

[35] While we have highlighted a defendant's right to be protected from the improper use of peremptory challenges, we recognize the Commonwealth's interest in prosecutions that are "tried before the tribunal which the Constitution regards as most likely to produce a fair result." *Singer* v. *United States*, 380 U.S. 24, 36 (1965). For this reason, we deem the Commonwealth equally to be entitled to a representative jury, unimpaired by improper exercise of peremptory challenges by the defense. Such a rule also serves to protect minority groups in the community. "For example, when a white defendant is charged with a crime against a black victim, the black community as a whole has a legitimate interest in participating in the trial proceedings; that interest will be defeated if the prosecutor does not have the power to thwart any defense attempt to strike all blacks from the jury on the ground of group bias alone." *People* v. *Wheeler, supra* at 282 n.29 The attempt of the defendants complained of in the Commonwealth's brief, but not objected to at trial, to strike all veniremen of Italian descent from the jury would, if established, fall within this

showing that (1) a pattern of conduct has developed whereby several prospective jurors who have been challenged peremptorily are members of a discrete group, and (2) there is a likelihood they are being excluded from the jury solely by reason of their group membership.

In this case, the pattern of conduct to which we refer was clearly demonstrated: twelve of thirteen eligible blacks were challenged by the prosecutor. The second element required to rebut the presumption of proper use of peremptory challenges was also shown by the defendants here. The disproportionate exclusion by the prosecution of ninety-two per cent of the prospective black jurors, as contrasted with thirty-four per cent of the available whites, sufficiently indicated the likelihood that blacks were being challenged because they were black. Further, although common group membership of a defendant and those jurors excluded is not a prerequisite to assertion of the right herein defined, it is a factor to be considered by the judge when he assesses whether the presumption of propriety has been rebutted. Common group membership of the victim and the majority of remaining jurors is likewise a significant factor. See note 31, *supra*. In the case at bar, the defendants and the disproportionately excluded jurors were black; the victim and the seated jurors, with the exception of one, were white.

Presented with evidence as to these two elements, the trial judge must determine whether to draw the reasonable inference that peremptory challenges have been exercised so as to exclude individuals on account of their group affiliation. Although decisions of this nature are always difficult, we are convinced that trial judges, given their extensive experience with jury empanelment, their knowledge of local conditions, and their familiarity with attorneys on both sides, will address these questions with the requisite sensitivity.

area of prohibited practice. Cf. *Commonwealth* v. *Graziano*, 368 Mass. 325 (1975).

Once the judge determines that the presumption has been rebutted, the burden shifts to the allegedly offending party to demonstrate, if possible, that the group members disproportionately excluded were not struck on account of their group affiliation. While he need not approximate the grounds required by a challenge for cause, his reason must pertain to the individual qualities of the prospective juror and not to that juror's group association. "He, too, may support his showing by reference to the totality of the circumstances: for example, it will be relevant if he can demonstrate that in the course of this same voir dire he also challenged similarly situated members of the majority group on identical or comparable grounds. And again we rely on the good judgment of the trial courts to distinguish bona fide reasons for such peremptories [*sic*] from sham excuses belatedly contrived to avoid admitting facts of group discrimination." *People* v. *Wheeler, supra* at 282.

We follow the suggestion of the *Wheeler* court with regard to the remedy which is appropriate in the event the judge finds that the use of peremptory challenges has been predicated on group affiliations: "If the court finds that the burden of justification is not sustained as to any of the questioned peremptory challenges, the presumption of their validity is rebutted. Accordingly, the court must then conclude that the jury as constituted fails to comply with the representative cross-section requirement, and it must dismiss the jurors thus far selected. So too it must quash any remaining venire, since the complaining party is entitled to a random draw from an entire venire—not one that has been partially or totally stripped of members of a cognizable group by the improper use of peremptory challenges. Upon such dismissal a different venire shall be drawn and the jury selection process may begin anew." *Id.*[36]

---

[36] The practice referred to by Brown, J., concurring in *Commonwealth* v. *Flowers, supra,* is consistent with this view. We note there

In the case before us, the defendants made a prima facie showing of improper exercise of peremptory challenges on the basis of group membership, and shifted the burden to the prosecutor to justify his challenges as predicated not on group affiliation, but on individual characteristics specific to each group member excluded. The defendants timely requested a hearing for this purpose. The judge asked the prosecutor if he wished to respond to these allegations; the prosecutor replied that he did not. The judge then denied the defendants' request. Applying the principles enunciated herein, we find that denial to have been error.

As we noted in *Commonwealth* v. *Gilday*, 367 Mass. 474, 499 n.3 (1975), "there are some constitutional rights so basic to a fair trial that their infraction can never be treated as harmless error." The right to be tried by an impartial jury of peers is one such right. See *People* v. *Wheeler*, *supra* at 283, and cases cited. The judge's failure to guarantee that right was prejudicial per se.

The judgments are reversed, the verdicts set aside and the cases remanded for a new trial,[37] to be conducted in

---

is no valid double jeopardy claim which a defendant can raise after such a declaration of a mistrial. See *United States* v. *Jorn*, 400 U.S. 470, 485 & n.12 (1971); *United States* v. *Tateo*, 377 U.S. 463, 467 (1964) (no double jeopardy claim on mistrial where defendant moves for or consents in same); *Commonwealth* v. *Ludwig*, 370 Mass. 31, 33 (1976) (no jeopardy attaches until jury are empaneled and sworn).

[37] Although Soares's appeal did not raise these issues, we require a new trial as to him for the reason that justice requires it. G. L. c. 278, § 33E. In reaching the conclusion that a new trial is required, we have considered carefully, and rejected, the alternative disposition of remanding the matter solely to determine the basis of the prosecutor's exercise of the peremptory challenges in issue. We do not consider this to be a realistic alternative. The trial judge has retired. More significantly, the conditions of the empanelment in issue cannot be easily recreated. The prospective jurors as they appeared at the empanelment will not be before the judge and their absence prevents a determination by the judge based on the totality of the circumstances as they existed at the critical time, including the demeanor of the prospective black jurors as compared with those of white veniremen. Thus, a crucial factor necessary for the proper exercise of the judge's

accordance with the procedures set forth herein.[38]

*So ordered.*

BRAUCHER, J. (concurring in the result, with whom Quirico and Wilkins, JJ., join). At the trial in 1977, the defendants properly raised the point that the prosecutor was using his peremptory challenges to cause the Commonwealth to discriminate against prospective black jurors on the basis of race. Given an opportunity to respond, the prosecutor declined, and the judge overruled the objections without further inquiry. The result was that twelve of the thirteen prospective black jurors, otherwise qualified, were excused. On the basis of the record of extraordinary circumstances in this particular case, and notwithstanding our decision in *Commonwealth* v. *Mitchell*, 367 Mass. 419, 420 (1975), I concur in the court's conclusion that the pattern of the prosecutor's conduct must be held to have exceeded the broad, but not limitless, range of discretion permitted in the exercise of peremptory challenges and to have violated the basic requirements of fairness. The defendants are therefore entitled to the relief ordered in the concluding paragraph of the court's opinion. Early in 1976 the then Chief Justice of the Superior Court declared a mistrial in similar cir-

responsibilities to "distinguish bona fide reasons for such peremptories [*sic*] from sham excuses belatedly contrived to avoid admitting acts of group discrimination," *People* v. *Wheeler, supra* at 282, would be missing. Last, we note that the prosecution does not argue for such a remedy should we accept the validity, as we have, of the defendants' contentions.

[38] The rule adopted today applies to the defendants in these cases and to the defendants in all cases now pending on direct appeal where the record is adequate to raise the issue. *Commonwealth* v. *Malone*, 376 Mass. 931 (1978). *Linkletter* v. *Walker*, 381 U.S. 618 (1965). See *Mackey* v. *United States*, 401 U.S. 667, 675-702 (1971) (Harlan, J., concurring); *Desist* v. *United States*, 394 U.S. 244, 256-269 (1969) (Harlan, J., dissenting). Cf. *Daniel* v. *Louisiana*, 420 U.S. 31 (1975) (held, the rule of *Taylor* v. *Louisiana*, 419 U.S. 522 [1975], is applicable prospectively only); *Commonwealth* v. *Core*, 370 Mass. 369 (1976); *People* v. *Wheeler, supra* at 283 n.31.

cumstances in the same county. See *Commonwealth* v. *Flowers,* 5 Mass. App. Ct. 557, 569 (1977) (Brown, J., concurring).

I see no occasion, however, for the decision of any constitutional question, State or Federal, for critical review of decisions of the Supreme Court of the United States, or for approval or disapproval of the decision of a sharply divided court in *People* v. *Wheeler,* 22 Cal. 3d 258 (1978). In particular, I refrain from attributing speculative types of "group bias" to members of "discrete groups." Moreover, this case presents no issue as to misuse of peremptory challenges by a criminal defendant, as to discrimination by reason of sex, or as to the quashing of a venire, and the court's discussion of such issues is not necessary to its decision. If we must ultimately consider such issues on a constitutional basis, it may be wise to defer to any guidance which may come from the United States Supreme Court on the basis of the United States Constitution. Holdings involving interpretation of the Massachusetts Constitution seem gratuitous and premature.