COMMONWEALTH *vs.* JOSEPH A. LeCLAIR.

Essex. March 2, 1999. - April 9, 1999.

Present: WILKINS, C.J., ABRAMS, LYNCH, FRIED, & IRELAND, JJ.

*Homicide. Practice, Criminal,* Instructions to jury, Challenge to jurors, Capital case. *Jury and Jurors.*

Evidence at the trial of a murder indictment did not support the defendant's claim that the victim's asserted revelation of infidelity just before she was killed was a "sudden discovery" such as would warrant a jury instruction on provocation to reduce the killing to manslaughter, and no substantial likelihood of a miscarriage of justice was created by the omission of that instruction. [316-317]

At a murder trial, there was no error in the judge's failure to use the words "cool reflection" in the judge's instruction to the jury on deliberate premeditation. [318]

The record of a criminal trial supported the judge's conclusions that the Commonwealth's peremptory challenges were properly being used and did not improperly exclude men [319, 321], and that the defendant had improperly challenged a juror on the basis of race [321-323].

INDICTMENT found and returned in the Superior Court Department on July 19, 1995.

The case was tried before *Robert A. Barton,* J.

*Charles K. Stephenson* for the defendant.

*Marcia H. Slingerland,* Assistant District Attorney (*Gerald P. Shea,* Assistant District Attorney, with her) for the Commonwealth.

IRELAND, J. The defendant was indicted for the murder of his fiancée. At trial, the defendant testified that he lost control and strangled the victim when she told him she recently had sexual intercourse with another man. It was his defense that her statement provoked his actions, and, therefore, he could not be guilty of murder in the first degree. After deliberating for several days, the jury found the defendant guilty of murder in the first degree. On appeal, the defendant argues that (1) the judge's instructions on manslaughter were erroneous; (2) the judge should

have used the phrase "cool reflection" in his instruction on premeditation; (3) he was denied his right to a jury of his peers by errors in the jury selection process; and (4) the cumulative effect of these errors created the substantial likelihood of a miscarriage of justice requiring us either to order a new trial or reduce the degree of guilt pursuant to our power under G. L. c. 278, § 33E. We affirm the conviction and see no reason to reduce the verdict or grant a new trial.

I

The defendant and the victim began dating in 1992. In 1993 they moved in together. The defendant testified that he and the victim became engaged in 1993. In the spring of 1995, the relationship began to deteriorate. The victim started going out socially without the defendant. This made the defendant jealous and precipitated several arguments between them. During one such argument, approximately one month prior to the murder, the defendant threatened the victim with a Samurai sword.

On the night before the murder, the victim drove the defendant to a bar in Revere, and, according to the defendant, agreed to pick him up after the bar closed. The victim then met a male friend at a bar in Chelsea. At approximately two o'clock the following morning, the defendant was driven home by a friend, Brian Doherty. On arrival at the defendant's home, the two consumed some wine and cocaine, and watched a pornographic movie. Doherty left the defendant's home at about 3:30 A.M.

The victim returned home at approximately 7 A.M. Shortly thereafter, a neighbor heard the victim yelling, "Joe, just leave me alone. Get away from me. I just want to go to sleep."

Later that morning the victim's former husband and their two children went to the victim's home.[1] They went to the house to pick up some clothing for one of the children. The house was locked and there was no answer at the door. One of the children entered the home through a window and then let in the others. While inside the house, they found the victim dead in her bed.

At 2:09 that afternoon, police from North Berwick, Maine, were dispatched based on a telephone call from the defendant's sister. She told the police that the defendant had been to her

---

[1] The children lived with the defendant and the victim. They had spent the night with their father.

house, told her he had killed someone in Massachusetts, and was going to kill himself. The North Berwick police subsequently located the defendant and placed him under arrest.

Later that afternoon, the defendant gave a statement to the Maine State police. In this statement, he described an argument he had had with the victim when she returned home that morning. At one point, the victim climbed into bed and pulled the sheets up over her head. The defendant continued to question her. "Then she said something about, something about a guy. That like [you're] not a guy [you're] a little boy or something." The defendant stated that in response he "just snapped," and strangled the victim.

That evening, while the defendant was still in Maine, the Massachusetts State police obtained a statement from him. The defendant repeated his story about the argument which had occurred when the victim returned home that morning. After the victim went to bed, the defendant went in to talk to her. "I said I just want to talk to you and I sat at the edge of the bed and she just like went off calling me names, baby, and [you're] nothing, I'm leaving you and I just . . . I couldn't take it and I snapped. . . . I just grabbed her [and strangled her]."

The defendant took the stand and repeated his story about the argument that morning. He testified that, as he persisted in asking the victim where she had been, "she just blurted out that she was with a black guy and his dick was bigger than mine and then I just [strangled] her." The defendant went on to say that he then "went blank" and the next thing he remembered was having a cramp in his thumb and then he stopped strangling the victim.

## II

The defendant's first argument is that the judge improperly instructed the jury on manslaughter. Specifically, the defendant cites as error the judge's instruction that words alone are insufficient provocation to reduce murder to manslaughter, without further instructing the jury that there is an exception to this general rule where a defendant learns, by way of an oral statement, of recent infidelity. In relevant part, the judge told the jury:

> "Now, the provocation sufficient to reduce an intentional killing to manslaughter is that provocation which would

likely produce in an ordinary person that state of passion, anger, fear, fright or excitement as might lead to an intentional homicide and does in fact actually produce that state of mind in this defendant. The law is clear that mere insulting words and threatening gestures alone with nothing else are not adequate provocation to reduce a killing from murder to manslaughter."

The defendant describes this instruction as "incomplete." The defendant requested an instruction tracking the language contained in *Commonwealth* v. *Bermudez*, 370 Mass. 438, 440-442 (1976),[2] specifically: "The existence of sufficient provocation is not foreclosed absolutely because a defendant learns of a fact from oral statements rather than from personal observation. A reasonable man can be expected to control the feelings aroused by an insult or an argument, but certain incidents may be as provocative when disclosed by words as when witnessed personally." During the precharge conference, the judge "allowed in substance" this instruction. However, it was never given to the jury.

The defendant testified that the victim told him, on the morning of the murder, that she had had intercourse with another man earlier that morning. He argues that, because this supposed revelation was made immediately prior to his killing her, the judge should have instructed the jury that they could consider the statement in deciding if there was adequate provocation. The judge's failure to do so "effectively foreclos[ed]" the jury from considering if there was provocation sufficient to reduce the killing to manslaughter. The absence of the instruction was not objected to at trial. Therefore, the question is whether this omission created a substantial likelihood of a miscarriage of justice. See *Commonwealth* v. *Rosa*, 422 Mass. 18, 29-30 (1996).

A killing is manslaughter if there is "provocation deemed adequate in law to cause the accused to lose his self-control in the heat of passion, and if the killing followed the provocation before sufficient time had elapsed for the accused's temper to cool." *Commonwealth* v. *Schnopps*, 383 Mass. 178, 180 (1981), *S.C.*, 390 Mass. 722 (1984). The general rule is that words alone are insufficient provocation to reduce murder to manslaughter. See *Commonwealth* v. *Anderson*, 396 Mass. 306, 314

---

[2]The defendant submitted fifty-three requests for jury instructions.

(1985). We have recognized an exception to this general rule, however, where the words convey inflammatory information to the defendant. See *Commonwealth* v. *Bermudez, supra* at 440-442. A sudden oral revelation of infidelity may be sufficient provocation to reduce murder to manslaughter. See *Commonwealth* v. *Schnopps, supra* at 181-182. But the revelation which is said to have precipitated the homicide must constitute a "sudden discovery" in order to reduce the degree of culpability. *Commonwealth* v. *Andrade,* 422 Mass. 236, 237-238 (1996). *Commonwealth* v. *Brown,* 387 Mass. 220, 228 (1982).

The evidence presented in this case forecloses a finding that there was a "sudden discovery" which provoked the attack on the victim. On the day of the murder, the defendant gave a tape-recorded statement to Detective Robert Slattery of the Maine State police.[3] In this statement the defendant stated that for several weeks prior to the murder he had suspected that the victim was seeing someone else. He suspected this because she would go out at night without him and would not return until early the following morning. Furthermore, the defendant testified at trial to having these suspicions. Where the defendant harbored these suspicions for a significant time prior to the victim's asserted revelation that she had, in fact, been unfaithful, he cannot successfully claim that her statement to him constituted a "sudden discovery." *Commonwealth* v. *Brown, supra* at 228. "Assuming the truth of these statements, they do not, in the circumstances, rise to the level of a 'sudden provocation' sufficient to reduce murder to manslaughter." *Id.* Because he had agreed to do so at the precharge conference, it would have been better for the judge to have included the qualifying language sought by the defendant in the jury charge. However, on the facts of this case we cannot say that the omission created a substantial likelihood of a miscarriage of justice.[4] See *Commonwealth* v. *Ruddock,* 428 Mass. 288, 291-292 (1998).

---

[3]The audio tape of the statement was played for the jury, and the jurors were given copies of a transcript to read as the tape was played.

[4]The Commonwealth argues that oral revelations of infidelity can only reduce murder to manslaughter if the parties are married. The defendant takes the position that we extended the oral provocation concept to "unmarried lovers" in *Commonwealth* v. *Jefferson,* 416 Mass. 258, 264 (1993), which involved an unmarried woman who stabbed her boy friend to death. Although given an instruction consistent with what the defendant here seeks, the jury found her guilty of murder in the first degree. The judge explained to the jury when words alone can be sufficient provocation, but he did not include this

## III

The defendant next cites as error the judge's failure to use the words "cool reflection" in defining deliberate premeditation. This argument is without merit. The defendant requested, and the judge agreed to give, in substance, an instruction which included the notion of cool reflection.[5] The judge did not use the cool reflection language in defining deliberate premeditation, and defense counsel timely objected. The judge denied defense counsel's request to reread the portion of the instruction on deliberate premeditation to include the cool reflection language.

In *Commonwealth* v. *Burke*, 414 Mass. 252, 266 (1993), we reviewed a jury charge on deliberate premeditation containing language identical to that used by the judge in this case.[6] There, we rejected the notion that the specific words "cool reflection" must be used in the instruction and held the language used was sufficient. *Id.* at 267. The defendant asks us to "reconsider" our ruling in *Burke*. The reasoning of *Burke* is as sound today as it was when the case was decided, and we see no reason to depart from its holding.[7] There was no error in the instruction as given.

explanation in the written instructions provided to them. The defendant argued that the explanation should have been included in the written instructions given to the jury. We ruled, in part, that "[n]othing in our opinion in [*Commonwealth* v. *Schnopps*, 383 Mass. 178, 180 (1981), *S.C.*, 390 Mass. 722 (1984)], however, suggests that a defendant who kills his or her spouse *or lover* is entitled to a manslaughter instruction especially tailored to the relationship between spouses *or lovers*" (emphasis added). *Id.* at 264. The Commonwealth views the language "or lovers" as dictum. The defendant sees our use of the words "or lovers" as an implicit understanding that the concept applies to "unmarried lovers" as well as to married couples. We do not reach this issue because we find that, even if the instruction should have been given, its omission did not create a substantial likelihood of a miscarriage of justice.

[5]The specific request read: "You may not find the defendant guilty of murder with deliberately premeditated malice aforethought unless you find beyond a reasonable doubt that he formed a resolution to kill the deceased, which resolution was a product of cool reflection and that, as a result of cool reflection, a plan to kill was formulated before it was acted upon."

[6]The language common to the two instructions defined deliberate premeditation, in part, by noting that there must be "[f]irst the deliberation and premeditation, then the decision to kill, and lastly the killing in furtherance of the decision."

[7]We also note that the Committee on Model Jury Instructions on Homicide (Draft Report 1999), in its proposed instruction on deliberate premeditation, does not include the word "cool." The relevant portion of the current draft

IV

The defendant also challenges the manner in which the jury were empaneled. Cited as error is the judge's refusal to inquire into the reason the Commonwealth exercised its first eight peremptory challenges to remove men from the jury and the judge's refusal to remove a juror challenged by the defendant. We find no error in either instance.

We first address the Commonwealth's use of peremptory challenges to remove several males from the jury panel. Peremptory challenges cannot be used "to exclude members of discrete groups solely on the basis of bias presumed to derive from that individual's membership in the group." *Commonwealth* v. *Soares*, 377 Mass. 461, 488, cert. denied, 444 U.S. 881 (1979). Gender is among the group affiliations on which peremptory challenges cannot be based. See *id.* at 489.

There is a presumption that peremptory challenges are being used properly. This presumption can be rebutted, however, where a party demonstrates a pattern of challenges directed at members of a discrete group and a likelihood that they are being challenged due to their membership in that group. See *id.* at 490. In certain circumstances, a single peremptory challenge can be enough to rebut the presumption of proper use. See *Commonwealth* v. *Curtiss*, 424 Mass. 78, 79 (1997), and cases cited. "Confronted with a claim that a peremptory challenge is being used to exclude members of a discrete group, the judge must 'determine whether to draw the reasonable inference that peremptory challenges have been exercised so as to exclude individuals on account of their group affiliation.' " *Id.* at 80-81, quoting *Commonwealth* v. *Soares, supra* at 490. Once the issue has been raised, the judge must find whether a prima facie showing of impropriety has been established. See *Commonwealth* v. *Burnett*, 418 Mass. 769, 771 (1994). In deciding whether a party has made the requisite prima facie showing, the makeup of the entire venire can be taken into account. See *Commonwealth* v. *Fryar*, 414 Mass. 732, 738 (1993), *S.C.*, 425 Mass. 237, cert. denied, 522 U.S. 1033 (1997) (presumption of propriety rebutted by the exercise of a single peremptory challenge by prosecutor where challenge removed sole black juror from venire); *Commonwealth* v. *Hyatt*, 409 Mass. 689, 692

reads: "The Commonwealth must show that the defendant's resolution to kill was, at least for some short period of time, the product of reflection."

(1991) (where venire from which replacement jurors were to come was all white, record would not support argument that removal of two white women was race based); *Commonwealth v. Harris*, 409 Mass. 461, 465-466 (1991) (single peremptory challenge by prosecutor can rebut presumption of propriety where that challenge is to remove the sole member of a protected group of which both the defendant and the juror are members). If the judge decides that the presumption has been rebutted, the burden is shifted to the party who exercised the challenges to show some group neutral ground for the challenges. See *Commonwealth v. Soares, supra* at 491. It is then for the judge to determine whether the proffered neutral explanation is legitimate. See *Commonwealth v. Burnett, supra* at 771.

Jury selection occurred over two days, and involved multiple venires. The defendant cites error in the judge's handling of peremptory challenges exercised on the first venire. The judge first questioned this venire as a group resulting in the removal of several potential jurors. After finding the venire indifferent, the exercise of peremptory challenges began. The first venire was made up of twenty-five men, and nineteen women. Of the initial group of sixteen jurors seated from this venire, eleven were men, and five were women.

The Commonwealth exercised its first round of peremptory challenges as a block, challenging eight of the men who had been seated, but no women. The defendant objected that the challenges appeared to be gender based, and asked that the Commonwealth be made to show some neutral ground for them. After counting the number of men and women in the jury box, the judge found that "[a]s of this moment, the presumption of regularity has not been rebutted." When he made this decision, the judge sat facing the venire from which the replacement jurors would be drawn. This venire then consisted of fourteen men and thirteen women.[8]

The Commonwealth next challenged three women, and then another man. The defendant renewed his request that the Commonwealth be made to provide a gender-neutral explanation for the challenges. The judge stated that he would wait until the Commonwealth was "finally content" to determine whether the challenges evidenced an intent to remove jurors based on their

___

[8]In addition there were three men and five women left seated in the jury box who had not been challenged.

gender.[9] When the Commonwealth was content, there were seven men and nine women seated. The matter was not directly revisited at that juncture. However, the judge did comment on the makeup of the jury. "Just so the record is abundantly clear, at this moment, before the defendant begins his peremptory challenges, there are seven males and nine females in the jury box." Although not explicitly stated on the record, it is a reasonable inference, based on the judge's earlier statements about waiting until the Commonwealth was finished before deciding if the presumption was rebutted, that the judge determined that, where the end result of the Commonwealth's peremptory challenges was a jury composed almost equally of men and women, the presumption had not been rebutted. In the end, the jury panel consisted of twelve men and four women. After the alternates were designated, the deliberating panel consisted of eleven men and one woman.

A trial judge is in the best position to decide if a peremptory challenge appears improper and requires an explanation by the party exercising it. Therefore, "we do not substitute our judgment [on whether the presumption has been rebutted] for his if there is support for it on the record." *Commonwealth* v. *Colon*, 408 Mass. 419, 440 (1990), quoting *Commonwealth* v. *DiMatteo*, 12 Mass. App. Ct. 547, 522 (1981). The first venire was made up of a majority of males. The first group of jurors seated from this venire was also made up of a majority of males. When the Commonwealth was finished with its peremptory challenges, the jury were composed of an almost equal number of men and women. The judge was aware of these facts when he made his ruling that the presumption of propriety had not been rebutted. The record supports the judge's finding that the presumption had not been rebutted, and, consequently, we find no error. Any doubt that the Commonwealth's peremptory challenges deprived the defendant of a trial before a fair and impartial jury of his peers is extinguished by the fact that the final deliberating panel was made up of eleven men and one woman.

The defendant also argues that the judge improperly blocked him from exercising one of his peremptory challenges. The defendant sought to challenge the only two black jurors in the venire, juror 8-4, and juror 8-3. Immediately prior to the

---

[9]The judge specifically stated, "When the Commonwealth is finally content, we will see how many men are seated and how many women are seated."

defendant's challenging the two jurors, the judge stated: "I also note there are two black jurors in the venire today and in the box. Before either one of you even considers wanting to challenge one of those two gentlemen, I suggest you call me over to side bar right now." At this prompting, the defendant indicated his intention to challenge both of the black jurors. The Commonwealth objected to the two challenges. In response to the Commonwealth's objection, the judge stated: "This Court finds that a prima facie showing of impropriety has been made." The judge went on to say that he found the prima facie showing was made because the two were "the only two black people in the entire venire."

As to juror 8-4, defense counsel conceded to the judge that the only real reason for the challenge was that the defendant was a racist. As to juror 8-3, defense counsel offered two reasons for the challenge beyond the defendant's racism. First, he felt juror 8-3's demeanor indicated that he was unsympathetic to the defendant. The second reason was that juror 8-3 had two young children, and he might be biased because the victim also had two young children. After hearing the defendant's explanation, and hearing from the Commonwealth, the judge ruled that the peremptory challenges to the jurors were "based solely" on their race, and, therefore, struck the two challenges.[10]

The defendant does not argue that the judge improperly blocked the peremptory challenge to juror 8-4. The defendant asserts that the judge erred in prohibiting him from exercising a peremptory challenge to remove juror 8-3 from the panel.

The judge found that the presumption of proper use had been rebutted by the defendant's exercise of peremptory challenges to exclude the only two black jurors on the venire. Whether the issue was initially raised by the Commonwealth or the judge, sua sponte, is immaterial. See *Commonwealth* v. *Curtiss*, *supra* at 80; *Commonwealth* v. *Reid*, 384 Mass. 247, 251 n.7 (1981)

---

[10]At the time of trial the victim's two children were thirteen and nine years of age. Of the peremptory challenges made by the defendant prior to this moment, five had been of jurors with young children with ages ranging from ten months to sixteen years. When the judge ruled that the defendant had not offered a sufficient race-neutral explanation for the two peremptories, the defendant repeated that one reason was that juror 8-3 had young children. Juror 8-3 had indicated on his questionnaire that he had two children, two and six years old. The defendant pointed out to the judge that his exclusion of juror 8-3 was consistent with his pattern of challenging other jurors with young children.

(judge entitled to act on his own motion). Once the judge determined that the presumption of proper use had been rebutted, the burden shifted to the defendant to provide a race-neutral reason for the challenge. See *Commonwealth* v. *Soares, supra* at 491. The defendant provided a race-neutral explanation for his challenge to juror 8-3. The judge, apparently, determined that it was disingenuous and found the challenges to be race based. The judge was entitled to reject the proffered explanation and conclude that an intent to discriminate was the true motive behind the challenges. See *Commonwealth* v. *Curtiss, supra* at 81; *Commonwealth* v. *Fruchtman,* 418 Mass. 8, 15, cert. denied, 513 U.S. 951 (1994) ("The determination whether the defendant's explanation for each challenge was sufficient to establish a nondiscriminatory basis [is] within the judge's discretion"). We shall not disturb a judge's ruling on whether a permissible ground for the peremptory challenge has been shown so long as there is support for the ruling in the record. See *id.,* quoting *Commonwealth* v. *DiMatteo, supra* at 552. Defense counsel admitted that the defendant was a racist and indicated that this was the reason for the challenge to juror 8-4; he then stated that he had a further reason for his challenge to juror 8-3. "Although defense counsel stated that his peremptory challenge was motivated by nonracial considerations, the judge was entitled to disbelieve him." *Commonwealth* v. *Curtiss, supra* at 82. The judge's ruling was supported by the record. There was no error.

V

Finally, the defendant seeks relief under G. L. c. 278, § 33E. Having reviewed the record, we find no reason to order a new trial or direct the entry of a lesser degree of guilt.

*Judgment affirmed.*