## Commonwealth *vs.* Edwin Rodriguez.

Essex. April 7, 2000. - June 22, 2000.

Present: MARSHALL, C.J., ABRAMS, IRELAND, SPINA, & COWIN, JJ.

*Jury and Jurors. Practice, Criminal,* Challenge to jurors, Instructions to jury, Capital case. *Homicide.*

Where, at the empanelment of the jury at a murder trial, the judge recognized that defense counsel was exercising his peremptory challenges to exclude women and then required defense counsel to state gender-neutral reasons for further challenges, the judge correctly disallowed the defendant's ninth and final challenge to a female juror upon counsel's stated reason that "the defendant [did] not like her looks." [807-809]

A judge at a criminal trial, although not using the words "sham" or "pretext" in disallowing a peremptory challenge to a female juror by defense counsel, nonetheless adequately expressed his finding that defense counsel's proffered gender-neutral explanation was insufficient [809-810], in circumstances in which the record supported the judge's finding that the defendant was challenging women jurors solely on the basis of gender [811].

At a murder trial, the evidence did not warrant an instruction to the jury on voluntary manslaughter, where the evidence did not support a finding that the defendant had "suddenly" discovered the infidelity of his spouse. [811-813]

INDICTMENT found and returned in the Superior Court Department on March 8, 1995.

The case was tried before *Richard E. Welch, III,* J.

*Eric S. Brandt,* Committee for Public Counsel Services, for the defendant.

*Gregory I. Massing,* Assistant District Attorney, for the Commonwealth.

ABRAMS, J. The defendant, Edwin Rodriguez, appeals from his conviction of murder in the first degree by deliberate premeditation and by extreme atrocity or cruelty.[1] On appeal, he

---

[1]The defendant also was convicted of armed assault in a dwelling. He does not challenge that conviction on appeal. His sentence on the armed assault in a dwelling runs concurrently with his sentence on murder in the first degree. The case did not go to the jury on a felony-murder theory.

argues that the judge erred in disallowing his peremptory challenge of the last juror seated on the panel. He also argues that the judge erred in denying his request for a jury instruction on voluntary manslaughter. We affirm the conviction of murder in the first degree. We conclude that there is no reason to grant the defendant a new trial or to enter a verdict of a lesser degree of guilt pursuant to our power under G. L. c. 278, § 33E.

1. *Facts.* The defendant and the victim, Nydia Vega, lived together in Puerto Rico for twenty-two years. They had four daughters, including Wanda Rodriguez, the eldest. Wanda moved to an apartment in Lawrence, Massachusetts, in the summer of 1994. While visiting Wanda during the summer, the victim met a man and began to spend time with him. In November, 1994, the victim returned to Massachusetts and moved in with Wanda. The victim continued to spend time with the other man after she moved in with Wanda.

On December 1, the defendant went to the apartment with a friend of his. The defendant said that he wanted to get back together with the victim, but the victim said that she no longer wanted to be with the defendant. The defendant became angry and hit the victim. He then approached her with a knife, yelling, "You have to come back to Puerto Rico with me because if you're not going to be mine, you're not going to be nobody elses [*sic*] either." The defendant's friend held him back and the victim ran from the apartment. She spent the night at her friend Rosa's apartment. The defendant stayed at Wanda's apartment that night.

The next morning, Wanda went to Rosa's apartment. Shortly thereafter, the defendant knocked on Rosa's door and called out the victim's name. Rosa's husband blocked the door and the defendant left. The victim stayed with Rosa for some additional time and then stayed with Rosemarie[2] Maldonado until January, 1995. The defendant continued to stay with Wanda. During this time, the defendant would grab the telephone from Wanda when Wanda was speaking with the victim. He began threatening the victim over the telephone. He told her of his suspicions that she was seeing someone else and said that he "was going to take her heart out through her mouth." At some point, the defendant brought a knife home and hid it under Wanda's bed.

In January, 1995, after the defendant learned where the victim

---

[2] At times, the witness also is referred to as Rosemary.

was staying, Wanda moved the victim to Angela Cancel's apartment in Lawrence. Several weeks after the victim moved there, the defendant learned where she was staying from Maldonado. On the morning of February 5, the defendant told Wanda, "I've just seen your mom. Come with me in order to avoid a tragedy." The defendant then took the knife from under Wanda's bed and left the apartment. He encountered an acquaintance, Oscar Nieves, who was walking down the street with his girl friend, Sandra Mercado. The defendant offered Nieves $50 to knock on the door of the apartment where the victim was staying. He did not tell Nieves his intentions. Nieves agreed and the defendant and Nieves drove to the apartment.

The defendant hid as Nieves knocked on the door, and then rushed into the apartment after the door was opened. The defendant banged on the victim's bedroom door and yelled for her to come out. Eventually, he successfully kicked the door open. The victim attempted to run away, but the defendant caught her and began stabbing her. The victim later died as a result of multiple stab wounds.

A neighbor, who had arrived at the apartment minutes before the defendant arrived, ran out to the street for help. Detective Walter Flanagan of the Methuen police department happened to be passing and stopped to assist. Moments later, the defendant ran out of the apartment building, covered with blood. Detective Flanagan radioed for assistance and drove behind the defendant as he ran down the street to his parked car. Detective Flanagan ordered the defendant out of the car.

Subsequently, Officer Melix Bonilla, a Lawrence police officer, arrived and put the defendant in a cruiser to transport him to the police station. In the cruiser, the defendant asked Bonilla whether the victim had died. Bonilla told the defendant that it was in his best interest to stay quiet. Despite this advice, the defendant said, "I don't care if she dies. She was playing me dirty anyways and I hope she does die that way she don't fuck anyone else. . . . I was a good man. I was giving money for my daughter, look what she did to me. I don't care if the Judge gives me 100 years, at least I can live in peace now that she's dead. I'm not a cabron."[3]

At the police station, after being advised of the Miranda

---

[3]Officer Bonilla explained that "cabron" was a derogatory word for a married man who knew his wife was having a sexual relationship with another man, but did nothing about it.

warnings, the defendant gave a statement. In his statement, the defendant said that the victim's relationship with the other man "had been going on since last year." He also stated that he had learned the day before the murder that the victim "had an affair going" with another man.[4]

2. *Peremptory challenge.* The defendant argues that the judge erred in disallowing the defendant's peremptory challenge of the last juror seated on the panel. Defense counsel[5] had used eight consecutive peremptory challenges to strike women and sought to use his ninth challenge also to strike a woman. The defendant's challenge was denied. The juror was seated and sworn, and participated in the deliberations.

"Peremptory challenges cannot be used 'to exclude members of discrete groups solely on the basis of bias presumed to derive from that individual's membership in the group.' *Commonwealth* v. *Soares*, 377 Mass. 461, 488, cert. denied, 444 U.S. 881 (1979). Gender is among the group affiliations on which peremptory challenges cannot be based." *Commonwealth* v. *LeClair*, 429 Mass. 313, 319 (1999). See *J.E.B.* v. *Alabama ex rel. T.B.*, 511 U.S. 127, 129 (1994).

"We begin with the assumption that the exercise of a peremptory challenge is proper. This assumption is rebuttable, however, on a showing that (1) there is a pattern of excluding members of a discrete group and (2) it is likely that individuals are being excluded solely on the basis of their membership within this group. See *Commonwealth* v. *Soares*, 377 Mass. 461, 490, cert. denied, 444 U.S. 881 (1979). See also *Commonwealth* v. *Hamilton*, 411 Mass. 313, 316 (1991); *Commonwealth* v. *Wood*, 389 Mass. 552, 561 (1983); *Commonwealth* v. *Reid*, 384 Mass. 247, 254 (1981)." *Commonwealth* v. *Curtiss*, 424 Mass. 78, 80 (1997). See *Commonwealth* v. *Burnett*, 418 Mass. 769, 770 (1994). "The judge is required to make a finding as to whether an initial prima facie showing of impropriety was established and specifically to determine whether the reasons advanced by the exercising party were 'bona fide or a mere sham.' " *Commonwealth* v. *Curtiss, supra* at 81. See *Commonwealth* v. *Calderon, ante* 21, 26 (2000).

---

[4]Rosemarie Maldonado testified that she told the defendant of the victim's relationship with another man "several days" before the victim's murder.

[5]The defendant is represented by different counsel on appeal.

There was a pattern of excluding women here.[6] Initially, defense counsel exercised six peremptory challenges, striking six of the eight women on the jury. The judge noted for the record that all six jurors struck by defense counsel were women, although the prosecutor did not object. After additional jurors were seated, defense counsel exercised his seventh challenge, again striking a woman. The judge then sua sponte moved "to make a finding here that there is a pattern that based on gender only women are being struck."

The judge, after finding a pattern of exclusion, required defense counsel to provide a gender-neutral reason for subsequent peremptory challenges of women. Defense counsel used his seventh and eighth challenges to strike women and offered reasons that the judge found to be independent of gender in each case.[7] A female juror was then seated. Attempting to use his ninth peremptory challenge, defense counsel informed the court, "on [the defendant's] instructions[,] I challenge this juror. He does not like her looks." The judge did not accept this challenge. The defendant now contends that defense counsel's explanation was group neutral because it was "personal to the juror and not based on the juror's group [membership]." *Purkett v. Elem*, 514 U.S. 765, 767 (1995). See *Commonwealth v. Green*, 420 Mass. 771, 778 (1995); *Commonwealth v. Lattimore*, 396 Mass. 446, 448 (1985), *S.C.*, 400 Mass. 1001 (1987). We disagree.

The judge implicitly recognized a prima facie showing of impropriety by finding a pattern and by requiring defense counsel to explain his reasons for challenging female jurors. See *Commonwealth v. Calderon*, *supra* at 25; *Commonwealth v. Curtiss*, *supra* at 82. Given this initial showing, the burden shifted to defense counsel "to provide a 'group-neutral reason' for the challenge." *Commonwealth v. Sarourt Nom,* 426 Mass. 152, 155 (1997), citing *Commonwealth v. Burnett*, *supra* at 771. "This reason need not be as specific as that required to justify a removal for cause, but general assertions are insufficient. *Commonwealth v. Soares*, *supra* at 491. Rather, the challenging party 'must give a "clear and reasonably specific" explanation of his "legitimate reasons" for exercising the challenges.' *Com-*

---

[6]The defendant concedes this point in his brief.

[7]Defense counsel stated that he was challenging one juror because she was a plaintiff in a harassment and stalking matter in the Superior Court. He objected to the other juror because she was a religious education director.

*monwealth* v. *Burnett, supra,* quoting *Batson* v. *Kentucky,* 476 U.S. 79, 98 n.20 (1986). These reasons must be 'personal to the juror and not based on the juror's group affiliation.' *Commonwealth* v. *Young,* 401 Mass. 390, 401 (1987)." *Commonwealth* v. *Sarourt Nom, supra* at 155.

Defense counsel here did not provide any explanation for his objection that "pertain[ed] to the individual qualities of the prospective juror and not to that juror's group association." *Commonwealth* v. *Soares, supra* at 491. The defendant's sole explanation that "[the defendant] does not like her looks" does not describe qualities particular to the prospective juror. As the trial judge observed, defense counsel could have made the same statement about every woman. The proffered reason was insufficient. See, e.g., *Commonwealth* v. *Calderon, supra* at 26-28 (challenge based primarily on juror's husband's occupation inadequate); *Commonwealth* v. *Burnett, supra* at 770 (challenge based on juror's occupation should not have been accepted as race-neutral).

By contrast, the objecting counsel in *Purkett, Green,* and *Lattimore,* upon which the defendant relies, each offered reasons beyond the prospective juror's looks. See *Purkett* v. *Elem,* 514 U.S. 765, 769 (1995) (juror challenged because of the juror's long, unkempt hair, mustache, and goatee and because prosecutor did not like the way he looked); *Commonwealth* v. *Green,* 420 Mass. 771, 778 (1995) (first challenged juror's sister-in-law was shooting victim; second challenged juror's father and brother were Boston police officers); *Commonwealth* v. *Lattimore, supra* at 448 (one juror challenged because he wore gold earring and because of his looks; second juror challenged "based on the fact that the juror lived with a nephew who had been convicted for carrying a gun"). We conclude that the defendant has not met his burden of providing a group-neutral explanation for the challenge.

The defendant next argues that the judge failed to make an explicit finding that the defendant's explanation was a sham or that the challenge was motivated by discriminatory intent. See *Commonwealth* v. *Calderon, supra* at 26-27; *Commonwealth* v. *Curtiss, supra* at 81; *Commonwealth* v. *Burnett, supra* at 771. Rather, the defendant suggests, the judge issued his ruling while operating under a misunderstanding of the law. Consequently, the defendant contends, the ruling disallowing the challenge should be reviewed without deference. These arguments have no merit.

.

A judge need not use any particular set of words in making a finding. *Commonwealth* v. *Curtiss, supra* at 82 n.3. In response to defense counsel's attempt to use his ninth peremptory challenge because "[the defendant] does not like her looks," the judge stated: "It's plain here that there has been a pattern of challenges to women. In fact every challenge [by] the [d]efendant has been to women. [Defense counsel] has set forth when asked to two excellent bases for challenging the last two. Unfortunately I think that [']he doesn't like her looks['] doesn't cut the mustard for appellate purposes. You could say that about every woman, I suppose, so even though I recognize that this is a first degree murder case that if I was on the [Supreme Judicial Court] I would say the [d]efendant — I would agree with your statement . . . that the [d]efendant should be able to utilize peremptory challenges for discriminatory reasons, but that's not the law as I understand it and therefore I can't accept that challenge."[8]

Defense counsel asked that his objection be noted for the record. Though the prosecutor did not object, the judge stated, "I don't think that gets me off the hook unfortunately. . . . I think it's contrary to the law to allow this use of peremptory challenge, therefore, with reluctance[,] I'm going to deny this use of the peremptory challenge . . . ." After additional conversation, the judge explained, "I think once I make the finding [of a pattern] and . . . there continues to be a consistent pattern, each and every one after the finding [must] be justified. . . . This one, I'm afraid I can't find it's a legitimate basis."

Although the judge did not label defense counsel's explanation either a "sham" or "pretext," he made other statements that were adequate. The judge stated that the explanation "doesn't cut the mustard" and that it was not "a legitimate basis." The judge's remarks, taken as a whole, support a determination that the explanation was insufficient and is entitled to deference. *Commonwealth* v. *Curtiss, supra* at 82 & n.4. See *Commonwealth* v. *LeClair,* 429 Mass. 313, 323 (1999) ("judge, *apparently,* determined that [the explanation] was disingenuous" [emphasis added]). In sum, a judge need not use the words "sham" or "pretext" but must make it clear that the explanation was inadequate.

---

[8]Our case law is consistent with Federal law. See *Purkett* v. *Elem,* 514 U.S. 765, 767-768 (1995); *Hernandez* v. *New York,* 500 U.S. 352, 358-359 (1991); *Batson* v. *Kentucky,* 476 U.S. 79, 96-98 (1986).

Additionally, the defendant contends that the circumstances did not support a finding that the defendant was challenging women solely on the basis of gender. He points to two key factors to support this argument. First, he states that the disproportionate number of women challenged may be explained, in part, because the jury venire and the jury panel had disproportionate percentages of women. See *Commonwealth* v. *LeClair, supra* at 319-321. Second, he argues that his acceptance of five women on the panel rebuts the notion that he was intentionally discriminating against women. See *Commonwealth* v. *Hyatt*, 409 Mass. 689, 692 (1991), *S.C.*, 419 Mass. 815 (1995). We disagree.

The two factors cited by the defendant do not convince us now that his challenge was proper. We grant deference to a judge's ruling on whether a permissible ground for the peremptory challenge has been shown and will not disturb it so long as it is supported by the record. *Commonwealth* v. *LeClair, supra* at 323. The judge here acknowledged that there were a "large number of women on th[e] jury panel." In addition, he must have been aware that the defendant had not challenged a number of women who remained on the panel. Nevertheless, the judge found that defense counsel did not offer a "legitimate basis" that was gender-neutral for his ninth peremptory challenge.

We conclude that this finding is supported by the record. Defense counsel used one hundred per cent of his challenges to strike women and did not strike any men. Further, defense counsel challenged nine of the fourteen women (sixty-four per cent) who sat as potential jurors while challenging none of the nine men (zero per cent) who sat as potential jurors. See *Commonwealth* v. *Soares*, 377 Mass. 461, 490 (1979) ("The disproportionate exclusion by the prosecution of ninety-two per cent of the prospective black jurors, as contrasted with thirty-four per cent of the available whites, sufficiently indicated the likelihood that blacks were being challenged because they were black"). See also *Commonwealth* v. *Hamilton*, 411 Mass. 313, 316-317 (1991) (prosecutor's challenge of sixty-seven per cent of prospective black jurors and fourteen per cent of available white jurors established prima facie showing of impropriety).

3. *Voluntary manslaughter instruction.* The defendant argues that the judge erred in failing to give a voluntary manslaughter instruction, as trial counsel requested. See *Commonwealth* v. *Andrade*, 422 Mass. 236, 237-238 (1996); *Commonwealth* v.

*Schnopps*, 383 Mass. 178, 180-181 (1981), *S.C.*, 390 Mass. 722 (1984). We conclude that there was no error.

"A killing committed subsequent to the *sudden* discovery of present spousal infidelity . . . before a reasonable person would be expected to regain emotional control and before the defendant has regained emotional control, could constitute voluntary manslaughter" (citations omitted). *Commonwealth* v. *Andrade*, *supra* at 238. In deciding whether the judge should have charged on manslaughter, we view the evidence in the light most favorable to the defendant. *Commonwealth* v. *Emerson*, 430 Mass. 378, 382-383 (1999), cert. denied, 529 U.S. 1030 (2000). " 'If any view of the evidence . . . would permit a verdict of manslaughter rather than murder, a manslaughter charge should be given.' *Commonwealth* v. *Brooks*, 422 Mass. 574, 578 (1996)." *Commonwealth* v. *Berry*, *ante* 326, 334 (2000). See *Commonwealth* v. *Emerson*, *supra*.

The defendant's argument that he is entitled to such an instruction is based on two facts: (1) the defendant learned the victim's address at least one day before the murder, but did not go to her at that point; and (2) the defendant saw the victim on the morning of the murder. Given these facts, the defendant concludes, it was inferable that the victim was with another man when the defendant saw her hours before her death, thereby entitling him to a voluntary manslaughter instruction. Assuming that these facts were present, we do not agree that they are sufficient to require an instruction on voluntary manslaughter.

"The evidence presented in this case forecloses a finding that there was a 'sudden discovery' which provoked the attack on the victim." *Commonwealth* v. *LeClair*, 429 Mass. 313, 317 (1999). The evidence reveals that the defendant had been suspicious of the victim's activities for several months. "Where the defendant harbored these suspicions for a significant time prior to [allegedly learning of the victim's infidelity], he cannot successfully claim that [confirmation of this infidelity] constituted a 'sudden discovery.' *Commonwealth* v. *Brown*, [387 Mass. 220,] 228 [(1982)]." *Commonwealth* v. *LeClair*, *supra*. There was no error in the denial of the request for a voluntary manslaughter instruction.

4. *Relief pursuant to G. L. c. 278, § 33E.* We have considered the entire record on the conviction of murder in the first degree pursuant to our obligation under G. L. c. 278, § 33E. We

conclude that the defendant is not entitled to a new trial or to entry of a lesser degree of guilt.

*Judgment affirmed.*