NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-11551


COMMONWEALTH  vs.  GREGORIO LOPEZ.



Suffolk.     March 11, 2016. - July 8, 2016.

Present:  Gants, C.J., Spina, Cordy, Botsford, & Hines, JJ.


Homicide.  Evidence, Prior violent conduct, State of mind, Self-
    defense.  Self-Defense.  Defense of Others.  Practice,
    Criminal, Capital case, State of mind, Argument by
    prosecutor.



Indictments found and returned in the Superior Court
Department on May 15, 2009.

The case was tried before Patrick F. Brady, J.


David Keighley for the defendant.
Sarah Montgomery Lewis, Assistant District Attorney (David
Fredette, Assistant District Attorney, with her) for the
Commonwealth.


SPINA, J.  The defendant, Gregorio "Mikey" Lopez,[1] appeals

from his conviction of murder in the first degree on theories of

_____

[1] The defendant's nickname was "Mikey."

deliberate premeditation and extreme atrocity or cruelty.[2]  The defendant shot and killed his girl friend's former boy friend in the early morning hours of March 11, 2009.  On appeal, the defendant argues that a new trial is required because (1) the trial judge abused his discretion when he refused to permit evidence of the victim's prior violence against the defendant's girl friend to be admitted and, by doing so, denied him his constitutional right to present a defense; (2) the prosecutor's comments in his closing argument severely prejudiced the defense; and (3) this court should require the defendant's state of mind to be considered in determining whether a murder is committed with extreme atrocity or cruelty and, by applying such a requirement to this case, the defendant's conviction of murder in the first degree based on the theory of extreme atrocity or cruelty should be overturned.  We affirm the conviction and decline to exercise our powers under G. L. c. 278, § 33E.

1.  <u>Background</u>.  The jury could have found the following facts.  At the time of the shooting, the defendant was staying with his girl friend, Desirae Ortiz, in one bedroom of a five-bedroom apartment on Mozart Street in the Jamaica Plain section of Boston.  Four additional people lived in the apartment, each renting a separate bedroom.  The tenants shared a kitchen and a

---

[2] The defendant was acquitted of carrying a firearm without a license under G. L. c. 269, § 10 (<u>a</u>).

bathroom. Insofar as relevant here, Ortiz lived, and the defendant stayed, in one bedroom, Jenicelee Vega lived in another bedroom, Moises Rivera lived in a third bedroom, and Gricelle Alvarado and her infant son lived in a fourth bedroom. Vega and Alvarado are cousins. The other individuals living in the apartment did not know each other prior to occupying the apartment. The defendant, Ortiz, Vega, Rivera, and Alvarado were all home the morning of the murder.

The defendant and Ortiz met during the winter of 2008-2009 and the defendant began to stay frequently with Ortiz on Mozart Street beginning shortly after February, 2009. Before dating the defendant, Ortiz had had a relationship with the victim. They had met when they were fourteen years old and had begun dating shortly thereafter. They were no longer dating at the time of the murder. However, Ortiz would speak with the victim in the months prior to the murder using the telephone at the house of their mutual friend. The defendant had knowledge of Ortiz's prior relationship with the victim but did not know that she was speaking recently to the victim on the telephone.

On March 10, 2009, photographs from a Massachusetts Bay Transportation Authority surveillance video camera showed the victim at the Massachusetts Avenue station at 12:34 A.M. and again at the Jackson Square station in Jamaica Plain at 12:47 A.M. The Mozart Street apartment is a short walk from the

Jackson Square station. At approximately 1 A.M. on March 11, 2009, Alvarado heard "loud banging" at the front door. She was in bed at the time. At first she tried to ignore the banging, but as it continued, she answered the door. She looked through the peephole of the front door and recognized the victim as Ortiz's boy friend.[3] It had been a while but she had seen the victim at the apartment before. Despite knowing who it was, she asked, "Who's this?" The victim asked whether Ortiz was home. Alvarado opened the door and told the victim that she did not know whether Ortiz was at the apartment or if she were sleeping. The victim told Alvarado that Ortiz was expecting him. Alvarado responded, "Well if she's expecting you, then you know what room is hers." She did not show the victim to Ortiz's room but she saw him walk through the kitchen in the direction of Ortiz's bedroom. She then returned to her bedroom.

The defendant and Ortiz were asleep. Ortiz was awakened by a knock on her bedroom door and the sound of the bedroom door opening. At first, she did not know who it was. She got up and walked toward the door, and realized that it was the victim. Ortiz was not expecting him that night. The victim forced himself into Ortiz's bedroom and Ortiz turned on the light. As Ortiz turned on the light, the victim saw the defendant in the

---

[3] Gricelle Alvarado testified that she recognized the victim as Ortiz's boy friend; Ortiz, however, testified that she and the victim were no longer together.

bed, naked. The victim, shocked by the presence of the defendant, threatened him. The victim said "he was going to blow his head off." The victim said that Ortiz was his "wife." The defendant did not respond. Ortiz did not see the victim with a weapon nor did she see him hit the defendant. At this point, Ortiz wanted the victim to leave so she told the defendant that she was going to speak to the victim outside. Ortiz left her cellular telephone in the bedroom. She and the victim proceeded to the landing outside the front door of the apartment, shutting the door behind them. The defendant remained in the bedroom. The victim and Ortiz were on the landing for approximately forty-five minutes. Ortiz and the victim did not shout, yell, or argue.

Meanwhile, at 1:35 A.M., Vega awoke when her cellular telephone rang. The caller identification indicated that the call was from Ortiz's cellular telephone. When Vega answered her cellular telephone, the defendant was speaking. The defendant said that there was an emergency and asked Vega to come to Ortiz's bedroom. Vega went to Ortiz's bedroom where the defendant appeared "really upset." The defendant told Vega that Ortiz was outside with her former boy friend and that the former boy friend showed him a gun. He asked Vega to take him up the street to get a gun. Vega refused and told him that she did not want to become involved. Vega left Ortiz's bedroom and did not

see the defendant leave the apartment.  Because she sensed something was going to happen, Vega went to Alvarado's bedroom and told her to get her son and leave the apartment.

At approximately 1:51 A.M., while she was in Alvarado's bedroom, Vega received another telephone call from the defendant, who was still using Ortiz's cellular telephone.  He told her that he was around the corner.  At one point while the defendant was not there, Alvarado became "curious" so she went to look through the peephole of the front door.  She saw Ortiz and the victim on the landing.[4]  She then returned to her bedroom.  At approximately 2:05 A.M., Vega received a third telephone call from the defendant.  He told Vega to tell the "guy" not to go anywhere and that he was on his way.  After the telephone calls, Vega went back to her room while Alvarado continued to get ready to leave the apartment.  A short time later, Vega saw the defendant enter the house through the back door.  She saw a "long, brown" gun in his hand that looked like a shotgun.  Alvarado saw the defendant walking down the hallway with a gun that looked like a rifle.  When she saw the defendant, Alvarado yelled at him to "stop, hold on" and to allow her and her son to leave.  At this time, the defendant was

---

[4] Vega also was curious when the defendant left the apartment.  She looked through the peephole and saw Ortiz and the victim having a conversation.  She did not see any physical confrontations or hear any arguing.

standing about two feet away from the front door.  The defendant responded, "Go ahead, go get your little man."

Alvarado returned to her bedroom, picked up her son, and started to walk toward Vega's bedroom, walking past the defendant.  Alvarado knocked on Vega's bedroom door and as Vega opened the door, she saw the defendant with his hand on the doorknob, looking through the peephole of the front door.  While the defendant was looking through the peephole, Vega did not hear fighting or shouting coming from the landing.  As Alvarado was entering the room and before Vega closed the door, Alvarado heard the front door open and she looked back to see the defendant raise the gun and shoot the victim.  She did not see anything in the victim's hands at the time he was shot.  Ortiz, still on the landing, saw the defendant open the door and without saying a word, shoot the victim.  Ortiz yelled, "No, Mikey, no," and, "[W]hy did you do this to me?"  The victim fell to the floor.  Rivera was walking to his bedroom door to go to the bathroom when he heard a "very loud" gunshot.  He did not hear arguing or shouting prior to hearing the gunshot.[5]  He checked his body and clothes for any signs of injury.  Once he knew he was not injured, he opened the door and saw the hands

---

[5] On cross-examination, Rivera stated that he heard arguing immediately before the gunshot.

and shoes of the victim on the landing, the defendant at the front door, and Ortiz in the hallway.

Rivera then saw the defendant pull the victim to the floor and begin to kick and curse at him.  The defendant walked toward Ortiz's bedroom and then returned to the landing.  The defendant began to grunt at the victim.  Rivera then saw the defendant leave the landing, return, and kick the victim again.  Ortiz also testified that the defendant returned to the landing three times, each time kicking and cursing the victim.  The defendant then left the apartment through the back door.  While leaving, he told Ortiz that he was trying to protect her.

Ortiz returned to the landing and attempted to perform cardiopulmonary resuscitation on the victim.  The victim tried to speak to Ortiz, but his speech was "very slurred" and he struggled to breathe.  Alvarado, while still in Vega's room, telephoned 911, as did Rivera.  When the police arrived, about five to ten minutes after the shooting, the victim was on the floor of the landing with a large gunshot wound to his lower right chest area.  The victim also had small abrasions on his forehead and chin.  The victim was pronounced dead at the scene between 2:15 A.M. and 2:30 A.M.  The cause of death was determined to be a shotgun wound to the torso, with injuries to

the liver, gallbladder, bowel, pancreas, aorta, and inferior vena cava.[6]

Prior to the commencement of trial, the trial judge allowed a motion in limine, filed by the Commonwealth, to exclude evidence of the victim's prior violence toward Ortiz.[7] The defendant argued that evidence of the prior violent relationship between the victim and Ortiz would be relevant to the defendant's state of mind to support his theory of self-defense and defense of another and as it relates to murder in the first and second degrees and manslaughter. The judge allowed the Commonwealth's motion but stated that he would reconsider if the evidence raised an issue of reasonable provocation, defense of another, or self-defense.

At the close of the Commonwealth's case and at the close of all the evidence, the defendant moved for a required finding of not guilty. The judge denied both motions. At the charge conference, the defendant argued that a jury instruction on extreme atrocity or cruelty should not be given because the judge refused to permit evidence of the prior violent relationship between the victim and Ortiz, thereby denying the

---

[6] The vena cava is the large vein that drains blood from the lower extremities back to the heart.

[7] The Commonwealth also filed a motion in limine to exclude evidence that the victim was incarcerated until March 10, 2009. The trial judge allowed this motion.

defendant the opportunity to present evidence of his state of mind and have the jury determine whether the killing was committed with extreme atrocity or cruelty.  The judge denied the defendant's request.  The defense theory was that the four other residents of the apartment conspired to convict the defendant.

2.  <u>Right to a defense</u>.  The defendant argues that the judge's refusal to admit evidence of the victim's prior violent relationship with Ortiz was an abuse of discretion because the evidence was admissible under Massachusetts common law, and that the defendant's constitutional right to present a defense was violated.  The Commonwealth argues that the judge properly excluded the evidence because the defendant failed to make a sufficient proffer as to the prior acts of violence, and the evidence was insufficient to support a claim of self-defense, defense of another, or manslaughter based on reasonable provocation.  We agree with the Commonwealth.

"The Sixth Amendment to the United States Constitution and art. 12 of the Massachusetts Declaration of Rights guarantee a criminal defendant's right to present a defense."  <u>Commonwealth</u> v. <u>Dagenais</u>, 437 Mass. 832, 839 (2002).  However, this right is not absolute.  "In the face of 'legitimate demands of the adversarial system,' this right may be tempered according to the discretion of the trial judge."  <u>Commonwealth</u> v. <u>Carroll</u>, 439

Mass. 547, 552 (2003), quoting Commonwealth v. Edgerly, 372 Mass. 337, 343 (1977). The judge refused to admit evidence of the victim's prior violent relationship with Ortiz because he concluded that the evidence was irrelevant in the absence of evidence of sufficient provocation, self-defense,[8] or defense of another. The judge indicated he would consider admitting the evidence if evidence of provocation, self-defense, or defense of another were presented.

Evidence of prior violent acts committed by the victim "known to the defendant at the time of the homicide" may be introduced in evidence when a claim of self-defense is raised "to support his assertion that he acted justifiably in reasonable apprehension of bodily harm." Commonwealth v. Fontes, 396 Mass. 733, 735-736 (1986). However, "[t]he incidents must not be remote (a discretionary matter for the trial judge) and other competent evidence must raise the question whether the defendant may have acted justifiably in his own defense." Id. at 736.

Here, the defendant did not establish when in time the prior acts of violence took place in relation to the murder, nor did he provide any details as to specific incidents. The

---

[8] The defendant does not claim that he was denied the opportunity to present evidence that the victim was the first aggressor. See Commonwealth v. Adjutant, 443 Mass. 649, 654 (2005).

defendant's proffer was merely that there was a "long term relationship" between the victim and Ortiz and that "he beat her pretty regularly." Defense counsel stated merely that he may inquire about one or two incidents but hoped that he did not have to "go into specific incidents." He did not offer any details of the victim's prior acts of violence. This proffer was not sufficient. See Commonwealth v. Campbell, 51 Mass. App. Ct. 479, 481-482 (2001).

Moreover, even if the proffer were sufficient, there was insufficient evidence that the defendant acted justifiably in his own defense. In order for self-defense to be a viable issue at trial, there must be sufficient evidence to create a reasonable doubt that the defendant "(1) had reasonable ground to believe and actually did believe that he was in imminent danger of death or serious bodily harm, from which he could save himself only by using deadly force, (2) had availed himself of all proper means to avoid physical combat before resorting to the use of deadly force, and (3) used no more force than was reasonably necessary in all the circumstances of the case." Commonwealth v. Harrington, 379 Mass. 446, 450 (1980). In this case, viewing the evidence in the light most favorable to the defendant, the evidence does not show that the defendant acted justifiably in his own defense. Commonwealth v. Pike, 428 Mass. 393, 395 (1998).

A defendant must avail himself of all proper means to avoid a physical confrontation before he resorted to fatally shooting the victim.  Harrington, supra at 450.  "This rule does not impose an absolute duty to retreat regardless of personal safety considerations . . . .  [An individual] must, however, use every reasonable avenue of escape available to him" (citations omitted).  Pike, supra at 398.  See Commonwealth v. Toon, 55 Mass. App. Ct. 642, 653-654 (2002).  In this case, the defendant did not use "every reasonable avenue escape available."  Pike, supra at 398.  After the initial verbal confrontation, the victim and Ortiz went to the landing outside the apartment's front door for approximately forty-five minutes, during which the defendant could have telephoned the police or taken further precautions such as leaving the apartment and not returning. Instead, the defendant made several telephone calls, left the apartment to retrieve a gun, returned to the apartment, allowed Alvarado to get her son, looked out the peephole of the front door, opened the front door, and then, without any warning, shot the victim approximately forty-five minutes after the initial confrontation.  Commonwealth v. Hart, 428 Mass. 614, 616 (1999) ("Indeed, the defendant had the opportunity to retreat and did so, but only to return a few minutes later armed with a loaded handgun").  There was no evidence that the defendant here attempted to avoid physical combat or that it was unreasonable

for him to retreat.  Therefore, there was insufficient evidence to support a theory of self-defense.  See Commonwealth v. Benoit, 452 Mass. 212, 227 (2008).  See also Pike, 428 Mass. at 399.

Nor was there evidence to support a theory of defense of another.  An individual may be justified in using deadly force against a person in defense of another when "(a) a reasonable person in the actor's position would believe his intervention to be necessary for the protection of the third person, and (b) in the circumstances as that reasonable person would believe them to be, the third person would be justified in using such force to protect himself."  Commonwealth v. Martin, 369 Mass. 640, 649 (1976).  Although there was evidence of a threat made inside Ortiz's bedroom, the threat was directed at the defendant, not Ortiz.  There was no evidence that the victim threatened Ortiz, either in the apartment or on the landing.  Alvarado was the only witness who testified that she heard some arguing and yelling between a male and female; however, it is unclear whether the defendant was in the apartment at that time. Despite the fact that the defendant told Ortiz that he was trying to protect her, a reasonable person in the defendant's position would not believe that Ortiz needed intervention to protect her from the victim, nor would it have been reasonable for Ortiz to have used deadly force to protect herself.  The

evidence was insufficient evidence to support a theory of defense of another.

Last, there was insufficient evidence of adequate provocation to support a voluntary manslaughter instruction. "A voluntary manslaughter instruction based on provocation is appropriate 'if there is evidence of provocation deemed adequate in law to cause the accused to lose his self-control in the heat of passion, and if the killing followed the provocation before sufficient time had elapsed for the accused's temper to cool.'" Commonwealth v. Colon, 449 Mass. 207, 220, cert. denied, 555 U.S. 1079 (2007), quoting Commonwealth v. Andrade, 422 Mass. 236, 237 (1996). Although there was evidence that the victim threatened the defendant inside Ortiz's bedroom, the victim did not lay his hands on the defendant, nor did he have a weapon at the time he was shot. The only conceivable threat to the defendant was when the victim said that he would "blow his head off." Words alone generally do not amount to sufficient provocation.[9] Commonwealth v. LeClair, 429 Mass. 313, 316 (1999). Even if these words caused the defendant to "lose his self-control in the heat of passion," the defendant had adequate time to compose himself and cool his temper in the forty-five

---

[9] There is an exception to this general rule when a victim "convey[s] inflammatory information to the defendant." Commonwealth v. LeClair, 429 Mass. 313, 317 (1999). This is not applicable in this case.

minutes between the confrontation and the shooting. Colon, supra at 220. During that time, the defendant left the apartment and returned with a loaded firearm. "Our cases suggest that even where sufficient provocation exists, if a defendant leaves the scene of the provocation (as here) and then returns to attack the victim, the defendant is considered to have had adequate opportunity for his anger to subside." Commonwealth v. Keohane, 444 Mass. 563, 568 (2005). Even if adequate provocation existed, the defendant had a sufficiently reasonable amount of time to cool off. A voluntary manslaughter instruction was not warranted.

Because there was insufficient evidence to support a theory of self-defense, defense of another, or sufficient provocation, evidence of a prior violent relationship between the victim and Ortiz was not relevant. The judge did not abuse his discretion in excluding such evidence, and the defendant's constitutional right to present a defense was not violated.

3. Prosecutor's closing argument. The defendant contends that certain comments made by the prosecutor during his closing argument unfairly prejudiced him where the prosecutor invited the jury to draw inferences from the absence of evidence regarding the victim's prior violence toward Ortiz that the Commonwealth successfully requested to exclude. Additionally,

the defendant argues that the prosecutor took advantage of the absence of the evidence.  We disagree.

The defendant takes issue with the comments made by the prosecutor in his closing argument to the effect that the defendant shot the victim because he was jealous, angry, humiliated, and embarrassed.[10]  Because defense counsel requested a mistrial at the conclusion of closing arguments, we review for prejudicial error.  Commonwealth v. Hrabak, 440 Mass. 650, 653-654 (2004).

In the closing arguments, a prosecutor may argue the evidence, draw conclusions, and assist the jury in evaluating and analyzing the evidence.  See Commonwealth v. Burgess, 450 Mass. 422, 437 (2008); Commonwealth v. Johnson, 429 Mass. 745, 750 (1999).  However, "[a] prosecutor is barred from referring in closing argument to matter that has been excluded from evidence . . . and a prosecutor should also refrain from inviting an inference from the jury about the same excluded subject matter" (citation omitted).  Commonwealth v. Grimshaw, 412 Mass. 505, 508 (1992).  Additionally, a prosecutor may not

---

[10] For example, the prosecutor in his closing statement stated:  "This man right here Gregorio Lopez was jealous.  He was angry.  He had just been in that bedroom.  His girlfriend, new girlfriend of three months, the girl is changing his life.  The girl is helping him move away from his mother's house.  He was living there.  Her old boyfriend came back at 1:30 in the morning, forced his way into that bedroom, humiliated him and made him angry.  He was jealous.  And he didn't call 911."

exploit the absence of evidence that was excluded at his or her request.  Commonwealth v. Harris, 443 Mass. 714, 732 (2005).  In this case, the defendant concedes that the prosecutor never made a direct reference to the excluded evidence (prior violent relationship).  Rather, he contends that the prosecutor took unfair advantage of the absence of excluded evidence when arguing motive, which the defendant could not contradict without the excluded evidence.  We disagree.

The prosecutor was responding to defense counsel's closing argument where he said that the four other occupants of the apartment conspired to convict the defendant.  The prosecutor was merely drawing reasonable inferences and conclusions from the evidence.  Commonwealth v. Fitzgerald, 376 Mass. 402, 421 (1978).  The prosecutor focused on the fact that the victim, who the defendant knew had been Ortiz's former boy friend, unexpectedly barged into the bedroom that the defendant shared with Ortiz.  The victim had referred to Ortiz as his "wife." Ortiz and the victim then left and were alone together for approximately forty-five minutes until the defendant opened the door and, without warning, shot the victim.  Vega testified that the defendant appeared "really upset" when she saw him alone in Ortiz's bedroom.  It is reasonable to infer from the evidence that the defendant was angry, jealous, embarrassed, and humiliated after the victim barged into his bedroom, where he

was naked and vulnerable.  Based on this record, it was not improper for the prosecutor to make these statements in his closing argument.

Even if the prosecutor's statements were improper, they do not warrant reversal.  See Commonwealth v. Wilson, 427 Mass. 336, 353 (1998).  Ortiz was standing on the landing with the victim when the defendant opened the door and shot the victim. Vega, prior to the defendant's shooting the victim, received three telephone calls from the defendant.  In the first call the defendant asked Vega to drive him up the street to get a gun. In the second and third calls, after the defendant left the apartment, the defendant told Vega that he was around the corner and he asked her to tell the victim not to go anywhere.  She then saw the defendant return and look out the peephole of the front door, all the while with a "large, brown" gun in his hand. Alvarado saw the defendant raise the gun and shoot the victim as she was running into Vega's room.  The prosecutor's statements were inconsequential in the face of the overwhelming evidence of deliberate premeditation.  Moreover, the judge instructed the jury that closing arguments were not evidence, that they must base their decision on the evidence as they recalled it, and that they alone were the judges of the facts.  Additionally, the judge instructed the jury that motive was not an element of the murder but that evidence of motive may be helpful in their

analysis of the case. The defendant suffered no prejudice by the comments made by the prosecutor in his closing statement.

4. <u>Defendant's state of mind</u>. The defendant urges us to adopt the concurring opinion of then Justice Gants in <u>Commonwealth</u> v. <u>Berry</u>, 466 Mass. 763, 777 (2014) (Gants, J., concurring), and conclude that a defendant's state of mind, or intent, must be considered as an element of the theory of extreme atrocity or cruelty, and not just in circumstances where the evidence suggested that the defendant had a mental impairment or was intoxicated by drugs or alcohol. Where the defendant also was convicted of murder on a theory of deliberate premeditation, we need not address this issue. See <u>Commonwealth</u> v. <u>Nolin</u>, 448 Mass. 207, 220 (2007).

5. <u>Review under G. L. c. 278, § 33E</u>. Having reviewed the entire record, we discern no basis to grant the defendant a new trial or reduce the degree of guilt.

<u>Judgment affirmed</u>.